**In re Katherine C. WELLS, Debtor.**

**Bankruptcy No. 98–3295–BKC–3P1.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Dec. 7, 1998.

Albert H. Mickler, Jacksonville, FL, for debtor.

Charles W. McBurney, Jacksonville, FL, for Michael Nortman.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

GEORGE L. PROCTOR, Bankruptcy
Judge.

This case is before the Court upon Motion
to Dismiss filed by Michael Nortman, Trustee for the Namtron Family Trust (collectively "Namtron"), and Motion to Reject
Executory Contract with Namtron filed by
Katherine C. Wells ("Debtor"). The motions were consolidated and hearings conducted on August 25, 1998 and September
17, 1998. Upon the evidence presented, the
Court enters the following Findings of Fact
and Conclusions of Law:

*FINDINGS OF FACT*

1. Debtor is a fifty-six year old widow.
During the course of her marital relationship,
her husband had operated as an entrepreneur and handled all of the financial aspects
of the business. Consequently, when her
husband died unexpectedly, Debtor had not
accumulated any financial or employment experience.

2. Debtor and her husband had accumulated several parcels of real property. Two
of the parcels are residential properties located on ocean front sites in Daytona Beach,
Florida. One of the lots is a rental property
and the other is Debtor's homestead. Volusia County has a tax claim against the rental
property for $6,619.06.

3. Debtor also owns a certain nine acre
parcel of commercial real property located in
Seminole County, Florida ("Seminole County
Property"). The three properties have five
mortgage holders retaining various lien interests totaling approximately $557,000.
(Namtron's Ex. 14).

4. During the course of Debtor's ownership of the Seminole County Property, mortgage liens, tax liens and other encumbrances
accumulated on the property to the extent of
approximately $402,000. (Debtor's Ex. 4, 5).

5. Ultimately, in February, 1997, Debtor
retained Emerald Realty, Inc., a commercial
real estate firm, and its president, Robert G.
Doher (collectively "Emerald Realty") in an
effort to sell the Seminole County Property.

6. Debtor received several written offers
from prospective purchasers through Emerald Realty, including one by Sembler Realty
for $2,095,000. However, none of the offers
materialized to closing. (Debtor's Ex. 6).

7. On March 20, 1998, Debtor received a
notice of "Intent to Levy" from the Internal
Revenue Service for a tax claim owing on the
Seminole County Property in the amount of
$408,768.

8. Debtor then informed Emerald Realty
to market the Seminole County Property at
an accelerated rate.

9. On April 20, 1998, Emerald Realty and
the Debtor called Namtron concerning the
sale of the Seminole County Property.

10. Debtor made an offer to Namtron to
sell the subject property for $1,000,000.

11. Namtron refused the initial offer and
counteroffered for $900,000.

12. Ultimately, after approximately four
hours of negotiations, Debtor and Namtron
entered into a commercial contract for the
purchase and sale of the Seminole County
Property ("Commercial Contract").

13. The parties agreed that Namtron
would pay $900,000 within three days. An
addendum to the contract was added which
provided for an additional $100,000 to be paid
to Debtor if the subject property was resold
by Namtron within six months of the Namtron/Wells closing.

14. Subsequently, Emerald Realty hired
Mr. Reinhard Stephan to act as escrow agent
and to conduct the closing on behalf of the
Debtor.

15. The closing was scheduled to take
place at Mr. Stephan's office on April 23,
1998.

16. Namtron tendered the full purchase
price, including deposit, to Mr. Stephan prior
to the scheduled date of closing.

17. On April 23, 1998, Namtron appeared
at Mr. Stephan's office ready and willing to
close on the Commercial Contract. The
Debtor failed to appear for closing.

18. On April 24, 1998, Namtron filed a
complaint in state court seeking specific per-

formance of the Commercial Contract. (Namtron Ex. 9). That same day Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. (Debtor's Ex. 6).

19. Upon Motion for Relief from the Automatic Stay filed by Namtron, this Court by its Order dated June 23, 1998, modified the stay as to Namtron so he could proceed with his specific performance suit against Debtor in state court. (Doc. 57). However, this Stay Relief Order specifically excludes Namtron from executing upon any judgment in his favor without further order of this Court.

20. On May 4, 1998, Debtor filed a Motion to Reject Executory Contract with Namtron. (Doc. 11). On May 28, 1998, Namtron filed a Motion to Dismiss pursuant to 11 U.S.C. § 1129(a)(3) on the grounds that Debtor's case was not filed in good faith. (Doc. 27). Hearings on Namtron's Motion to Dismiss and Debtor's Motion to Reject Executory Contract were conducted on August 25, 1998, and September 17, 1998.

21. Four issues were raised at the September 17, 1998 hearing: (1) Whether Namtron has standing to be heard on its Motion to Dismiss; (2) Whether this Court's holding in *In re Jacksonville Riverfront Development, Ltd.*, 215 B.R. 239 (Bankr.M.D.Fla. 1997), precludes this Court from finding this Debtor lacked good faith in filing her bankruptcy petition; (3) Whether, in light of the Supreme Court's decision in *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991), and the 11th Circuit's opinion in *In re Moog,* 774 F.2d 1073 (11th Cir.1985), an individual debtor not engaged in business is a factor this Court can consider in determining whether or not the Debtor filed her Chapter 11 petition in bad faith; and (4) Whether the subject Commercial Contract the Debtor seeks to reject is executory.

22. Subsequent to these hearings, on October 6, 1998, Namtron filed two proofs of claim, one seeking return of the subject real property, and the other for an unsecured claim for attorney's fees pursuant to the Commercial Contract. (Namtron's App. E and F).

***ADDITIONAL FACTS***

23. In paragraph four, the Commercial Contract includes, in relevant part, the following provision:

4. TITLE: SELLER has the legal capacity to and shall convey marketable title to the property....

(a) Evidence of Title: SELLER shall at √ SELLER'S ☐ BUYER'S expense and within 5 days from √ Effective Date .... Deliver to BUYER

√ a title insurance commitment by a Florida licensed title insurer and, upon BUYER recording the deed, an ALTA owners policy....

BUYER shall, within.... 7 days from receipt of the commitment, deliver written notice to SELLER of title defects. Title shall be deemed acceptable to BUYER if (1) BUYER fails to deliver proper notice of defects or (2) BUYER delivers proper notice and SELLER cures the defects within 5 days from receipt of the notice ("Curative Period"). If the defects are cured within the curative period, closing shall occur within 10 days from receipt by BUYER of notice of such curing. SELLER may elect not to cure defects if SELLER reasonably believes any defect cannot be cured within the Curative Period. If the defects are not cured within the Curative Period, BUYER shall have 10 days from receipt of notice of SELLER'S inability to cure the defects to elect whether to terminate this contract or accept title subject to existing defects and close the transaction *with*[1] reduction in purchase price.

With respect to buyer's remedies as a result of seller's default, the Commercial Contract provided:

10. **Default:**

(A) In the event the sale is not closed due to any default or any failure on the part of **seller** other than failure to make the title

---

1. The word "with" was written into the contract, but had not been initialed to by Debtor as other changes had been. The absence of Debtor's initials with respect to such a crucial change raises suspicions about the credibility of the Commercial Contract.

marketable after diligent effort **buyer** may either (1) receive a refund of **buyer's** deposit(s) or (2) seek specific performance. . . .

24. Following the filing of Debtor's Chapter 11 petition, Namtron requested a refund of the $900,000 total purchase price that had been deposited with the closing attorney/escrow agent. The escrow agent wired the money back to Namtron. (Debtor's Ex. 2).

### Conclusions of Law

Debtor's motion seeks to reject an executory contract entered into with Namtron pursuant to § 365(a). Namtron's § 1112(b) dismissal motion is predicated upon the assertion that the Debtor's petition was filed in bad faith. The Court will first address the threshold question of whether Namtron has standing to seek dismissal, because if standing is lacking, the dismissal motion will be moot. Next, if necessary, the Court will address the dismissal motion, because if dismissal is proper, the issues of executoriness and contract-rejection will be moot.

### I. Standing to Request Motion to Dismiss pursuant to 11 U.S.C. §§ 1112(b); 1129(a)(3)

The bankruptcy court may dismiss a chapter 11 case on request of a "party in interest," after notice and a hearing. 11 U.S.C. § 1112(b) (1997). Debtor argues that Namtron lacks standing to request dismissal because he is not a "party in interest" as the term is used in 11 U.S.C. § 1112(b). 11 U.S.C. § 1112(b); *see also* 11 U.S.C. § 1109(b) (1997) (listing who has right to be heard under chapter 11). Although "party in

interest" is not specifically defined in § 1109(b) or otherwise in the Bankruptcy Code ("the Code"), the Debtor claims that "party in interest" is defined inversely in 11 U.S.C. § 101(14). Section 101(14) defines "disinterested person" as "not a creditor" or equity security holder or insider. 11 U.S.C. § 101(14) (1998). Therefore, Debtor contends the Code intended the term "party in interest" to mean "creditor" as inversely defined from § 101(14). *See* 11 U.S.C. § 101(10) (defining "creditor" as entity that has a "claim" against Debtor that arose at time or before order of relief concerning Debtor).

The crux of Debtor's argument relies on this Court finding the Wells/Namtron Contract to be executory. The Debtor asserts that since the contract is executory, any "claim" Namtron may have only arises after rejection and subsequent breach. *See* 11 U.S.C. §§ 502(g); 365(g) (1997); *see also* 11 U.S.C. § 101(5) (1998) (defining "claim" as "right to payment" or equitable remedy for breach of performance if such breach gives rise to right to payment). Accordingly, the Debtor argues that since Namtron did not have a "claim" or "right to payment" at the time the bankruptcy petition was filed, Namtron was not a "creditor" or "party in interest," and consequently lacked standing to file a motion to dismiss.

Namtron argues that he is a "creditor" of the bankruptcy estate, and therefore, has "party in interest" standing to bring a motion to dismiss. First, Namtron bases this argument on the fact that he has filed two proofs of claim in this bankruptcy case.[2] Second,

2. The filing of a proof of claim generally allows a party to assert "creditor" standing under Bankruptcy Code § 1112(b) pending determination of its allowability. *See In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir.1991) (noting "creditor" may move for dismissal under § 1112(b), whether or not its claim has yet been allowed); *see e.g., In re Stamford Color Photo, Inc.*, 105 B.R. 204, 206-07 (Bankr.D.Conn.1989) (holder of unsecured claim, scheduled as disputed and contingent, who failed to file timely proof of claim, not entitled to share in distribution but nonetheless enjoyed § 1112(b) standing as "creditor," with "right to payment"); *In re Welwood Corp.*, 60 B.R. 319, 321 (Bankr.M.D.Fla.1986) (holder of disputed claim was "creditor," as defined in § 101(9)(A), entitled to request § 1112(b) dis-

missal); *but see In re J.M. Check Cashing Corp.*, 49 B.R. 273, 277 (Bankr.E.D.N.Y.1985) (holding facially meritless proof of claim which evidences no "right to payment," disputed or otherwise, cannot confer creditor standing upon the holder). However, this Court is of the opinion that because Namtron's filing of his Motion to Dismiss and this Court's hearing on the motion preceded Namtron's filing of his Proofs of Claims, standing could not have been conferred on him in this manner. However, this Court does not hold that a party's failure to file a proof of claim, filing one untimely, or filing one after bringing a dismissal motion will necessarily result in the party losing its "creditor" status or its standing to move for dismissal. *See In re Stamford Color Photo, Inc.*, (noting failure to file proof

Namtron asserts that standing was conferred on him because the Debtor specifically listed him as an unsecured creditor in her schedules. (Doc. 13). Third, Namtron contends standing was otherwise bestowed upon him when he was made a party to the case when Debtor filed her Motion to Reject Executory Contract with him. (Doc. 11).

■■■ Under 11 U.S.C. § 1109(b), "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." ·11 U.S.C. § 1109(b) (1998). However, this list of examples is not exhaustive and not meant to exclude other types of interested parties from the purview of the section. *In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985) (noting "party in interest" is not confined to list of examples provided in section 1109(b)). In fact, the Code makes explicit that the word "including" is not a limiting term as used in the Code. 11 U.S.C. § 102(3) ("In this title—.... (3) 'includes' and 'including' are not limiting"). As a result, determining whether a party enjoys "party in interest" status is a recurring problem in the bankruptcy arena and requires a case by case analysis. *Id.; See In re Ofty Corp.,* 44 B.R. 479, 481 (Bankr.D.Del.1984) (observing "An entity may be [a] real party in interest and have standing in one respect while he may lack standing for another purpose."); *see also In re River Bend–Oxford Assocs.,* 114 B.R. 111, 113 (Bankr.D.Md.1990) (noting "Party in interest is an expandable concept depending on the particular factual context in which it is applied.... [,]" and should be determined "within the specific reorganization process context for which the determination is sought.").

Courts have recognized that the term "party in interest" should be construed broadly to allow all parties affected by a chapter 11 proceeding to be heard. *See e.g., Amatex Corp.,* 755 F.2d at 1042; *In re Johns–Manville Corp.,* 36 B.R. 743, 754 (Bankr.S.D.N.Y. 1984), *a'ffd,* 52 B.R. 940 (S.D.N.Y.1985)

("[T]he concept of 'party in interest' is an elastic and broad one designed to give the Court great latitude to insure fair representation of all constituencies impacted in any significant way by a chapter 11 case."). The most frequently cited view on the breadth of party in interest standing comes from the Third Circuit in *Amatex,* 755 F.2d at 1034. In *Amatex,* the court found that individuals who had been exposed to asbestos, and thus had the potential to contract and sue for asbestos-related diseases, were sufficiently affected by the reorganization of an asbestos manufacturer to be entitled to be heard in the proceeding. 755 F.2d at 1042. The Third Circuit noted that "courts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." *Id.; see In re Kaiser Steel Corp.,* 998 F.2d 783, 788 (10th Cir.1993) (quoting *Amatex*); *Unofficial Committee of Zero Coupon Noteholders v. Grand Union Co.,* 179 B.R. 56, 58–59 (D.Del.1995) (same). Unfortunately, courts have not established a general test to determine what constitutes the requisite stake. *See In re Peachtree Lane Assocs.,* 188 B.R. 815 n. 8, 825 (N.D.Ill. 1995) (noting courts appear to implicitly employ test—"[we] know a sufficient stake when [we] see it.") (quoting *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring)).

■■■ However, because of § 1109(b)'s broad scope, this Court is of the opinion that anyone who has a pecuniary interest, practical stake, or legally protected interest that could be affected by the bankruptcy proceeding is entitled to assert that interest to any issue to which it pertains. *See In re Charter Co.,* 68 B.R. 225, 227 (Bankr.M.D.Fla.1986); *Unofficial Committee of Zero Coupon Noteholders,* 179 B.R. at 58; *Matter of James Wilson Assocs.,* 965 F.2d 160, 169 (7th Cir. 1992).

■■■ Namtron's "stake" in the underlying chapter 11 case is clear, and it seems apparent that he ought be permitted to seek dis-

of claim doesn't extinguish viability of creditor's claim or "creditor" status; merely eliminates

creditor's right to distribution).

missal. Namtron has a direct legal and pecuniary interest in the outcome of this bankruptcy case. This Court has previously granted Namtron limited relief from the Automatic Stay by its Order dated June 23, 1998. (Doc. 57). However, this Order does not allow Namtron to execute upon any judgment obtained in state court. Since dismissal of the present case would render moot any further proceedings on Namtron's Motion for Relief from Stay and would allow him to execute upon a state court judgment, he has a direct legal and pecuniary interest in this Chapter 11 case.

Furthermore, simply because Namtron had not filed his proofs of claims until after he brought his motion does not preclude him from seeking dismissal. While a party who wishes to participate in the distribution of an estate is required to file a proof of its claim, and while that participation can be denied by the disallowance of the claim, the underlying claim continues to exist and has viability until it is discharged. *See Gaudio v. Stamford Color Photo, Inc., (In re Stamford Color Photo, Inc.)*, 105 B.R. 204, 206 (Bankr.D.Conn.1989) (citing *Turner v. United States, (In re G.S. Omni Corp.)*, 835 F.2d 1317, 1318–19 (10th Cir.1987)). Moreover, since Debtor has listed Namtron as an unsecured creditor in her schedules [3], despite asserting the claim is valueless, Debtor implicitly recognizes that Namtron has a "claim" against her as defined in section 101(5) of the Code, regardless whether such payment is disputed or undisputed. 11 U.S.C. § 101(5) (1998). Accordingly, because the "claim" was in existence at the time Namtron brought his motion to dismiss, and he has a legal and pecuniary interest in the outcome of this bankruptcy case, he has standing to seek dismissal.

## II. Section 1112 Dismissal for Bad Faith Filing

A case under Chapter 11 may be dismissed for cause pursuant to section 1112 of the Bankruptcy Code. 11 U.S.C. § 1112(b) (1998). Section 1112 of the Code provides in relevant part that:

(b) .... the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter whichever is in the best interests of creditors and the estate, for cause ....

11 U.S.C. § 1112(b).

While this subsection list several factors constituting "cause" for dismissal, the list is not exhaustive. *In the Matter of Welwood Corp.*, 60 B.R. 319, 321 (Bankr.M.D.Fla.1986). The term "cause" was meant to be flexible to allow courts to consider other factors as they arise, and use their equitable powers to reach an appropriate result in each case. *In re Maricamp Square Assoc.*, 139 B.R. 554, 557 (Bankr.M.D.Fla.1992).

The Eleventh Circuit has firmly established that good faith is an implicit prerequisite to filing a Chapter 11 bankruptcy petition. *In re Albany Partners, Ltd. v. Westbrook, (In re Albany Partners, Ltd.)*, 749 F.2d 670 (11th Cir.1984). Further, courts in this circuit have found a lack a good faith constitutes "cause" to dismiss a case under § 1112(b). *Id.; Matter of Hulse*, 66 B.R. 681 (Bankr.M.D.Fla.1986); *In re Albany Partners, Ltd.*, 749 F.2d 670; *Natural Land Corp. v. Baker Farms, Inc., (In re Natural Land Corp.)*, 825 F.2d 296 (11th Cir.1987). Although, there is no particular test for determining whether a debtor has filed a petition in bad faith, courts may consider any factors which evidence "an intent to abuse the judicial process of the reorganization provisions" or, in particular, factors which evidence that the case was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988) (citing *In re Albany Partners, Ltd.*, 749 F.2d at 674).

## B. *Section 1112(b) Bad Faith Analysis in Light of In re Jacksonville Riverfront Development, Ltd., 215 B.R. 239 (Bankr.M.D.Fla.1997)*

This Court has previously held that the *Phoenix Piccadilly* factors, which are present in the majority of single asset real estate cases, are no longer relevant in deciding

---

**3.** Debtor lists Namtron as Michael Nortman, Trustee, in her Schedules.

whether a single asset Chapter 11 case is filed in bad faith. *In re Jacksonville Riverfront Development, Ltd.*, 215 B.R. 239 (Bankr.M.D.Fla.1997); *Phoenix Piccadilly*, 849 F.2d at 1393. In *Phoenix Piccadilly*, the Eleventh Circuit Court of Appeals affirmed the District Court's decision affirming this Court's dismissal of a case for cause pursuant to section 1112(b). 849 F.2d at 1393. The Eleventh Circuit affirmed the finding of bad faith based on the presence of many circumstantial factors which may be indicative of a bad faith filing:

(i) *The Debtor has only one asset*, the Property, in which it does not hold legal title;

(ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;

(iii) The Debtor has few employees;

(iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and

(vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*Id.* at 1394–95 (emphasis added) (citations omitted).

Since the impact of the *Phoenix Piccadilly* decision had been to bar the large majority of single asset bankruptcy cases, this Court, in *Jacksonville Riverfront*, found that the application of those factors directly conflicts with the Congressional intent of the Bankruptcy Reform Act of 1994 ("Reform Act"). 215 B.R. at 244; *see* Pub.L. No. 103–394 (1994). The Reform Act added the following definition of "single asset real estate":

"single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debt-

or other than the business of operating the real property and activities incidental thereto having aggregate noncontingent liquidated secured debts in an amount no more than $4,000,000.

11 U.S.C. § 101(51B).

Moreover, the Reform Act added a section providing a time frame to expedite single asset real estate cases. Section 362(d) provides that the automatic stay will be lifted in a single asset real estate case after 90 days, unless the debtor files a plan with a reasonable possibility of confirmation, or commences payments to creditors whose claims are secured by the subject real estate. 11 U.S.C. § 362(d)(3).

Despite the fact that the subject property in *Jacksonville Riverfront* did not fall within the definition of "single asset real estate," this Court found that Congress had clearly expressed its intention that the automatic stay not be lifted, and the case not be dismissed, simply because the case was a single asset real estate case. *Jacksonville Riverfront*, 215 B.R. at 244. This Court based its holding on the Reform Act's policy which established that single asset real estate bankruptcies are also to be entitled to the protections of the bankruptcy process. *Id.* at 244, n. 5. Therefore, this Court held that the *Phoenix Piccadilly* factors are no longer applicable when deciding whether there is a bad faith filing in a single asset real estate case. *Jacksonville Riverfront*, 215 B.R. at 245.

 However, in *Jacksonville Riverfront*, this Court did not specifically reject the application of the *Phoenix Piccadilly* factors in analyzing whether bad faith exists in multiple asset cases. *Jacksonville Riverfront*, 215 B.R. at 239. Therefore, this Court may properly consider the factors from the *Phoenix Piccadilly* test when determining if a multiple asset case is filed in bad faith, and thus, evidences an intent by the Debtor to abuse the judicial process or frustrate the efforts of secured creditors to enforce their rights. *See Jacksonville Riverfront*, 215 B.R. at 244; *In re Albany Partners, Ltd.*, 749 F.2d at 674.

### B. Section 1112(b) Bad Faith Analysis in Light of In re Moog, 774 F.2d 1073 (11th Cir.1985) and Toibb v. Radloff, 501 U.S. 157 (1991)

The United States Supreme Court has held that an individual debtor is eligible to reorganize under chapter 11, even if that individual does not have an ongoing business. *Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). Thus, the Court validated what had been the law in the Eleventh Circuit for several years. *In re Moog*, 774 F.2d 1073 (11th Cir.1985).

However, prior to the Supreme Court's decision in *Toibb*, courts in this circuit have recognized that while being an individual debtor, not engaged in business, by itself cannot form the sole ground for dismissal of a chapter 11 case, it remains a factor which may be considered by the court when passing on a party's challenge to a debtor's right to maintain the case. *See In re Moog*, 774 F.2d at 1074 (noting chapter 11 might be appropriate to consumer debtors under certain circumstances); *Matter of Welwood Corp.*, 60 B.R. 319, 321 (Bankr.M.D.Fla.1986) (holding, despite *In re Moog*, that being an individual debtor filing under chapter 11 remains factor when determining if "cause" exists under § 1112(b) motion to dismiss).

■■■ However, this Court is of the opinion that in light of *Toibb*, being an individual Chapter 11 debtor, not engaged in business, is not a factor this Court may consider when determining whether a petition was filed in bad faith. *See generally, Toibb*, 501 U.S. at 165, 111 S.Ct. 2197 ("Congress knew how to restrict recourse to the avenues of bankruptcy relief; it did not place Chapter 11 reorganization beyond the reach of a nonbusiness individual debtor"). As the Supreme Court has noted, ample protections exist which insure that individuals do not abuse the Chapter 11 process. *Toibb*, 501 U.S. at 165–66, 111 S.Ct. 2197. Individual debtors must comply with the requirements of chapter 11 and are governed by the same guidelines as business debtors. *Id.; In re*

*Canion*, 129 B.R. 465, 469 (Bankr.S.D.Tex. 1989). Further, as this Court has previously noted, the standards of § 1112(b) equally govern individuals who reorganize under chapter 11. *In re Heald*, 140 B.R. 817 (Bankr.M.D.Fla.1992). Accordingly, this Court will not consider the fact that an individual is a nonbusiness debtor as a component of its bad faith analysis as this would improperly restrict Chapter 11 eligibility in light of *Toibb*, 501 U.S. at 165–66, 111 S.Ct. 2197.

### C. Merits of § 1112(b) Motion to Dismiss

■■■ Namtron contends the Debtor has filed her case in bad faith. Namtron relies on the several factors outlined by the Eleventh Circuit in *Phoenix Piccadilly* as indicative of a lack of good faith on her part. *See Phoenix Piccadilly*, 849 F.2d 1393 (noting nonexhaustive list of items illustrative of bad faith filing). First, Namtron contends the timing of Debtor's filing, which occurred shortly after entering into the Commercial Contract, evidences an intent to delay or frustrate the legitimate efforts of her secured creditors in enforcing their rights. However, Namtron is not a secured creditor as he possesses no mortgage or security interest in the Seminole County Property.[4] Further, as the Court notes below, the power to reject executory contracts is implicit in the Code, and absent other factors, bad faith will not be implied solely because a debtor files in an attempt to reject a financially burdensome contract.

Next, Namtron argues that Debtor's financial problems are essentially a dispute between the Movant and the Debtor which can better be resolved in state court. However, the Debtor's financial problems involve more than Namtron's specific performance lawsuit. The Debtor's financial problems involve multiple parcels of real property with multiple lien claims by state and federal taxing authorities and various mortgage holders.[5] Moreover, if this Court finds that the Com-

---

4. Namtron does, however, have a disputed interest in the subject property via the *lis pendens* filed in connection with his state court specific performance lawsuit.

5. This Court finds, and as both parties concede, this case is clearly a multiple asset, multiple creditor, Chapter 11 reorganization.

mercial Contract is executory, and subsequently rejected by Debtor, Namtron's state court specific performance suit [6] will be moot. Therefore, in all likelihood, Debtor's several financial difficulties will initially best be handled by the bankruptcy court and the reorganization provisions of the Code.

Namtron also contends that because the debtor has no employees and is not in business, her case was not filed in good faith. However, Namtron ignores the plain language of § 109, Supreme Court precedent, and the long history of allowing individuals to reorganize under Chapter 11. *See* 11 U.S.C. § 109 (1997) (noting who may be debtor in bankruptcy); *Toibb,* 501 U.S. at 165–66, 111 S.Ct. 2197 (interpreting § 109, and noting plain language does not exclude individuals from filing under Chapter 11). Therefore, Namtron mistakenly relies on these factors when he asks this Court to determine if Debtor has filed her case in bad faith.

■ Lastly, Namtron argues that Debtor's filing was nothing more than an attempt to get out of a contract that she didn't like. Nonetheless, the fact that Debtor seeks to revoke the Commercial Contract is not, by itself, indicative of bad faith. Chapter 11 gives a debtor a second chance through the reorganization process, which includes the right to attempt to reject a potential executory contract that may be financially burdensome to the estate. *See* 11 U.S.C. § 365 (1998); *In re Marina Enter., Inc.,* 14 B.R. 327 (Bankr.S.D.Fla.1981) (holding not abuse of judicial process to file solely to reject executory contract); *In re W & L Assoc., Inc.,* 71 B.R. 962, 967 (Bankr.E.D.Pa.1987) (same). Moreover, as noted earlier, this is a multiple asset-multiple creditor bankruptcy which was filed by Debtor for the purpose of dealing with her several creditors through an orderly liquidation of certain parcels of real estate. (Debtor's Ex. 6).

Namtron cites *Chinichian v. Campolongo,* 784 F.2d 1440 (9th Cir.1996), in an attempt to show that bad faith exists simply because a debtor files for bankruptcy to prevent the consummation of a state court specific performance judgment. However, the facts of *Chinichian* are distinguishable from the present case. 784 F.2d at 1444. The Court in *Chinichian* found, in concluding the petition was filed solely to defeat the state court action, several bad faith factors present, including the fact that the debtors were not financially distressed, had very speculative creditors and were not having difficulty in meeting their financial obligations. 784 F.2d at 1445. *See In re Waldron,* 785 F.2d 936, 940 (11th Cir.1986), *cert. dismissed,* 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763; *see also In re Bofill,* 25 B.R. 550 (Bankr. S.D.N.Y.1982); *In re Marina Enterprises,* 14 B.R. 327 (holding financially troubled debtors not precluded from using Chapter 7 or 11 solely to avoid executory contract). The *Chinichian* Court then properly held that, taken together, these factors revealed bad faith. 784 F.2d at 1445. The court did not find the filing, by itself, to be the sole basis for the bad faith dismissal. *Id.*

■ In the present case, the evidence presented is insufficient to show any bad faith on the part of the Debtor in filing her bankruptcy petition. The Court does not find any improper conduct [7] on part of the Debtor that would justify a finding of a bad faith filing. Additionally, the evidence does not establish that the Debtor intended to abuse the judicial process or the reorganization provisions of Chapter 11. Moreover, the Debtor's proposed plan and disclosure statement evidences the Debtor's desire and ability to accomplish an effective reorganization. Thus, the Court finds that the petition was filed in good faith with the sincere intent to reorganize.

---

6. Namtron also contends Debtor's reorganization depends on the outcome of the state court litigation. On the one hand, Namtron argues Debtor must be successful in defeating the pending specific performance suit in order to fund the plan. However, on the other hand, Namtron argues that Debtor must assume the contract, if it is found to be executory, contending this will be in the best interests of the creditors and the estate. The Court finds this argument inapposite.

7. Namtron alleged the Debtor was untruthful in her Schedules, however, he failed to set forth credible evidence to substantiate those claims.

## II. Section 365 Motion to Reject Executory Contract

 Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (1998). In Chapter 11 cases, the debtor-in-possession succeeds to this power pursuant to § 1107(a). 11 U.S.C. § 1107(a) (1998). The authority to reject certain contracts is essential to the bankruptcy process and provides a mechanism through which extreme economic burdens may be alleviated while the debtor attempts to reorganize. *See Sun City Investments Inc.*, 89 B.R. 245, 247 (Bankr.M.D.Fla.1988); *In re Jolly*, 574 F.2d 349, 350 (6th Cir.1978).

This Court on prior occasions has adopted Professor Countryman's pre-code definition of executory contract as the proper construction of the term: "An executory contract is 'a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute material breach excusing performance of the other.' " *See e.g. In re Maralak, Ltd.*, 104 B.R. 446, 450 (Bankr. M.D.Fla.1989) (citing Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973)); *In re Charter Co.*, 52 B.R. 267 (Bankr.M.D.Fla.1985) (citing *In re J.M. Fields, Inc.*, 22 B.R. 861 (S.D.N.Y. 1982)). Countryman's definition is supported by the legislative history of the Code which notes: "Although there is no precise definition of what contracts are executory, it generally includes contracts in which performance remains due to some extent on both sides." H.R.Rep. No. 95–595, 95th Cong., 2nd Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303.

The Court finds unperformed obligations on the part of both parties to the purchase and sale transaction. As evidenced by the deposition testimony of the closing attorney, there were numerous unresolved issues that needed to be addressed before a proper closing could have occurred. (Stephan Depo. at 5–12). Both parties needed to resolve the technical issues concerning the addendum to the Commercial Contract relating to the potential resale of the Seminole County Property. Both parties needed to resolve issues relating to retail and billboard leases and other ongoing liens which encumber the subject property. The payment and pro-ration of taxes, closing attorney fees, and the execution of numerous other documents in connection with the closing, including owner's affidavits, tax I.D. numbers and DR–219 documents, were left unresolved.

 Moreover, the escrow agreement and closing statement were not executed, and the deed had not been delivered. Namtron had not taken possession of the subject property and Debtor had not accepted any funds. Debtor had not delivered a title insurance commitment, and thus, Namtron had not delivered written notice of title defects. Clearly, no closing had occurred. In fact, the closing attorney indicated he was not prepared to close on the Seminole County Property on the scheduled closing date. (Stephan Depo. 8–10). Further, pursuant to the terms of the Commercial Contract, Namtron clearly had the right to elect not to proceed with the transaction and to recover the funds placed in escrow. Therefore, as material obligations on both sides [8] of the contract had yet to be performed, the Court concludes that this contract is executory, and thus, subject to rejection pursuant to § 365(a).

 Ordinarily, the decision to assume or reject an executory contract is left entirely to the debtor. *Sun City Investments*, 89 B.R. at 248. Subsequently, the Court should give perfunctory approval of the decision subject only to the business judgment rule. *Id.* (citing *In re Bildisco*, 682 F.2d 72, 79 (3d Cir.1982), *aff'd sub nom., N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

---

**8.** Debtor asserts the Eleventh Circuit has recently expanded the definition of "executory contract" in its 1996 decision in *Sipes v. Atlantic Gulf Communities Corp.*, 84 F.3d 1364 (11th Cir. 1996). However, since this definition appears somewhat broader than the Countryman Test, and this Court has found material unperformed obligations outstanding on the part of both parties, regardless of which definition is used, this contract remains executory.

Under this standard, courts should approve a debtor's decision to reject such a contract where the latter demonstrates that rejection will benefit the debtor's estate or reorganizational efforts. *Id.; see e.g., In re Del Grosso,* 115 B.R. 136, 138 (Bankr.N.D.Ill.1990).

Here, the Debtor has produced credible evidence that rejection will benefit the estate and assist in a successful reorganization. The executory contract only provides for a gross sale price of $900,000. The evidence presented is convincing that the fair market value of the subject property more closely approximates $1.5 million. The Debtor's Plan of Reorganization proposes to sell the property at a higher price more commensurate with the market value. This will allow Debtor to retain her other commercial property, help her to maintain her living expenses, and ultimately pay her creditors a greater amount. Therefore, the rejection serves to benefit the estate, and thus, is rejected pursuant to § 365(a).

### CONCLUSION

After considering the evidence presented, the Court concludes that Namtron's Motion to Dismiss pursuant to § 1112(b) for bad faith filing is not well taken, and is thus overruled. Additionally, the Court finds that pursuant to Debtor's § 365(a) motion, the Commercial Contract is properly rejected as executory and in the best interests of the estate. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.