**In re Gerald P. BOUGHTON, Debtor.**

**Bankruptcy No. 98–10235–3P1.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Jan. 18, 2000.

Bruce Russell, Washington, D.C., for Internal Revenue Service.

Gerald P. Boughton, Orange City, Florida, debtor pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Chief Judge.

This case came before the Court upon Debtor's Objection to Claim 3 filed by the Internal Revenue Service ("IRS") and upon the IRS' Motion to Dismiss. (Docs. 15, 32.) The Court consolidated the matters and after hearings on July 1 and August 10, 1999, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. On July 27, 1998 the IRS assessed individual income taxes against Debtor for 1992, 1993, and 1994. (IRS Ex. 1.)

2. On November 6, 1998 the IRS filed a Notice of Federal Tax Lien against Debtor in Volusia County, Florida for the 1992, 1993, and 1994 taxes in the amount of $545,412.18. (*Id.*)

3. On December 2, 1998 Debtor filed a petition under Chapter 11 of the Bankruptcy Code. (Doc. 1.)

4. On February 22, 1999 the IRS filed a Proof of Claim in the amount of $737,-446.50, which it designated as secured in the amount of $561,943.92 for the 1992, 1993, and 1994 taxes, calculated as follows:

|  | 1992 | 1993 | 1994 |
|---|---|---|---|
| Tax: | $56,773.00 | $72,823.00 | $75,562.00 |
| Penalty to Petition Date: | $70,727.19 | $59,709.69 | $62,859.86 |
| Interest to Petition Date: | $57,307.75 | $59,719.03 | $46,462.40 |

The proof of claim also included an unsecured priority claim of $97,300.11 and an unsecured general claim of $78,202.47 for 1995, 1996, and 1997 individual income taxes. The Clerk designated the claim as Claim 3. (IRS Ex. 1.)

5. Debtor filed an Objection to Claim 3. Debtor contends that the IRS' secured claim for 1992, 1993, and 1994 can not exceed the amount of his assets. Debtor also contends that the IRS' claim for 1995, 1996, and 1997 does not take into account his 1995, 1996, and 1997 returns which were filed on January 21, 1999. (Doc. 15.)

6. On June 24, 1999, the IRS filed a Motion to Dismiss for Lack of Good Faith.

7. The Court consolidated Debtor's Objection to Claim 3 and the IRS' Motion to Dismiss and held hearings on July 1, 1999 and August 10, 1999.

8. Debtor litigated his 1992, 1993, and 1994 tax liabilities in the United States Tax Court. On March 10, 1998 the Tax Court issued an opinion which found that Debtor filed fraudulent documents with the Secretary of State of Florida and Clerk of Volusia County in order to cloud the title of his residence, office building, and vehicles. Also, the court found that he placed ownership of his real and personal property, including all bank accounts, in the names of nominees. The court found that the purpose of Debtor's actions was to "conceal, mislead or otherwise prevent the collection of federal income tax due and owing from him." (IRS Ex. 51 at 97–98.) The Tax Court decision was affirmed by the Eleventh Circuit Court of Appeals on May 11, 1999. (IRS Ex. 52.)

9. Debtor opened the Boughton Chiropractic Center in Orange City, Florida in 1989. (Gerald P. Boughton June 15, 1999 Dep. at 9.) Debtor purchased the property upon which the business was located ("business property") with a $172,500 mortgage from John Krebs. (IRS Ex. 12.) Debtor engaged in the following transactions as to the business property.

10. On July 19, 1992 Debtor filed a Declaration of Trust for the Boughton Family Trust in the public records of Volusia County, Florida. The Declaration pro-

vided, among other things, that Debtor and Madelyn Boughton, Debtor's former wife, ("former wife") were not citizens of the United States or of Florida but were merely sojourning in Florida and that they were not taxpayers. Debtor and former wife were the trustees and former wife was the sole beneficiary of the trust. (IRS Ex. 3.)

11. On March 12, 1993 Debtor transferred the business property to Michael Norris ("Norris") for no consideration. (IRS Ex. 12.)

12. On March 15, 1993 Norris transferred the business property to the Boughton Family Trust for no consideration. (IRS Ex. 14.)

13. On December 8, 1993 the United States filed a Notice of Federal Tax Lien against the Boughton Family Trust as the nominee of Debtor and former wife for 1991 taxes owed by Debtor and former wife. (IRS Ex. 17.) The lien attached to the business property, the personal residence, and any motor vehicles owned by and titled to the Boughton Family Trust.

14. On April 4, 1994 Debtor transferred the business property from the Boughton Family Trust to the Brisco Management # 4 Holding Trust for no consideration. (IRS.Ex.21.)

15. Despite the April 4, 1994 transfer, Debtor made monthly mortgage payments to John Krebs in the amount of $2,279.60 toward the mortgage until the end of 1997. (IRS Ex. 53.)

16. A Final Judgment of Dissolution of Marriage between Debtor and former wife was entered on April 4, 1997 in the circuit court in Volusia County. The circuit court identified Debtor as the owner of the business property and awarded sole ownership to him. Former wife executed a quit claim deed to the property. (IRS Ex. 24.)

17. On December 17, 1997 Norris executed a warranty deed transferring the business property to Debtor and former wife as co-trustees of the Boughton Family Trust dated July 19, 1992. (IRS Ex. 29.)

18. On December 18, 1997 Debtor and former wife executed a document entitled Memorandum of Trust which referred to the business property and provided that the Boughton Family Trust dated July 19, 1992 was in full force and effect, that Debtor and former wife were trustees, and that former wife was the sole beneficiary of the trust. (IRS Ex. 31.)

19. On December 18, 1997 Debtor and former wife individually, and as trustees of the Boughton Family Trust dated July 19, 1992 transferred the business property to Debtor as Trustee of the Brisco Management Trust dated April 4, 1994. (IRS Ex. 30.)

20. On December 18, 1997 Debtor executed a warranty deed transferring the business property back to Norris. (IRS Ex. 28.)

21. Both the Memorandum of Trust and the warranty deed transferring the property to Norris were recorded in the public records of Volusia County on January 8, 1998. (IRS Exs. 28, 31.)

22. On January 2, 1998 Debtor executed an Affidavit of Trust which provided that Debtor was the only Trustee of the Brisco Management Trust dated April 4, 1994. (IRS Ex. 33.) Debtor also filed an Affidavit of Trustee on January 2, 1998 which provided that the only asset of the Brisco Management Trust dated April 4, 1994 was the business property and that the Brisco Management Trust dated April 4, 1994 was the same trust as the Brisco Management # 4 Holding Trust. (IRS Ex. 34.) The purpose of the Affidavits was to obtain a mortgage loan as to the business property from Fidelity Bank of Florida.

23. On January 2, 1998 Debtor, not individually, but as Trustee of the Brisco Management Trust dated April 4, 1994 obtained a $120,000.00 mortgage loan from Fidelity Bank of Florida which encum-

bered the business property.[1] (IRS Ex. 35.)

24. With the proceeds of the mortgage loan from Fidelity Bank, Debtor satisfied the Krebs mortgage on January 5, 1998. (IRS Ex. 36.) The satisfaction was recorded on January 30, 1998.

25. Debtor resigned as Trustee of Brisco Management Holding Trust # 4 by letter dated December 10, 1998 to the Board of Trustees of the Brisco Management Holding Trust # 4. (IRS Ex. 42.)

26. On December 16, 1998 Debtor appointed a successor Trustee, Eileen Hines ("Hines") who allegedly resides in Hawaii. (Id.)

27. On December 21, 1998 Hines transferred the property to Richard Beauregard ("Beauregard") by warranty deed. (IRS Ex. 43.) The documentary stamp tax was $1,134.00. On that day Beauregard obtained a $160,000.00 mortgage loan secured by the business property from First Community Bank of Florida. (IRS Ex. 44.)

28. On December 30, 1998 Debtor's mortgage to Fidelity Bank was satisfied. (IRS Ex. 41.) The satisfaction of mortgage was recorded on February 10, 1999.

29. Debtor's resignation as Trustee of the Brisco Management Holding Trust # 4, appointment of a successor Trustee, transfer of the property to a third party, and satisfaction of the Fidelity Bank mortgage were subsequent to the filing of the bankruptcy petition.

30. None of the transactions as to the business property were listed on Debtor's statement of financial affairs. (Doc. 2, Tr. July 1, 1999 at 80.)

31. Debtor's bankruptcy schedules do not disclose an interest in any trust. (Doc. 2.)

32. At his deposition, Debtor testified that he does not believe that the gross receipts from his chiropractic practice were taxable as a matter of law. (Gerald P. Boughton June 15, 1999 Dep. at 54.)

33. At his deposition and at the July 1, 1999 hearing on Debtor's Objection to Claim, Debtor refused to answer questions regarding the various trusts he established or the assets contained therein, citing a Covenant of Silence and the Fifth Amendment. Debtor also testified at the July 1, 1999 hearing that he invoked the Fifth Amendment after being told to do so over the phone by an attorney he found in the telephone book during a break in the deposition.[2]

## CONCLUSIONS OF LAW

### IRS' Motion to Dismiss

The Court initially addresses the IRS' Motion to Dismiss. The IRS contends that Debtor's pre-petition and post-petition conduct including the establishment of sham trusts to conceal his income and assets, failure to report the trusts on his bankruptcy schedules, transfer of estate

---

1. Debtor obtained the loan despite the federal tax lien which attached to the business property by virtue of the Notice of Federal Tax Lien filed on December 8, 1993 against the Boughton Family Trust, the trust into which Norris transferred the business property on March 15, 1993.

2. The following exchange took place between Debtor and the Court:
    A: Plus during my break, I had gone out, and I called counsel. And they told me to use the Fifth, so that's what I did.
    Q: Are you represented by?
    A: I'm not, no.
    Q: Is that your counsel?

A: No, I had just called the phone book just to get some advice.
Q: You took a recess, you went out, and you called someone who was listed in the phone book?
A: Right. And I just over the phone, he-he just gave me free counsel, per se, and just—
Q: And you did not pay anything for that?
A: No.
Q: That lawyer had never been retained?
A: No.
Q: And did he not know you?
A: Right.
Tr. July 1, 1999 at 94–95.

property after the filing of the petition, and failure to cooperate with the IRS' discovery efforts constitute bad faith and are grounds for dismissal of the case. Debtor argues that the IRS has not proven that he engaged in any fraudulent activity and that to the contrary, he has been cooperative, honest, and straightforward.

■ A Chapter 11 case may be dismissed for cause pursuant to § 1112 of the Bankruptcy Code which provides in relevant part: "... the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause ..." 11 U.S.C. § 1112(b) (West 2000). Section 1112(b)'s list of ten grounds which constitute cause for dismissal is not exhaustive. *In re Jacksonville Riverfront Dev. Ltd.,* 215 B.R. 239, 242 (Bankr.M.D.Fla.1997). The Eleventh Circuit has firmly established that good faith is an implicit prerequisite to filing a Chapter 11 bankruptcy petition. *In re Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir.1984). Lack of good faith also constitutes cause for dismissal pursuant to § 1112(b). *In re Double W Enterprises, Inc.* 240 B.R. 450, 453 (Bankr.M.D.Fla. 1999) (citing *In re Albany Partners); In re Wells,* 227 B.R. 553, 560 (Bankr. M.D.Fla.1998); *Jacksonville Riverfront,* 215 B.R. at 243. Although there is no particular test for determining whether a

debtor has filed a petition in bad faith, courts may consider any factors which evidence "an intent to abuse the judicial process of the reorganization provisions" or, in particular, factors which evidence that the case was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Wells,* 227 B.R. at 560 (citing *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988)) (citation omitted).[3]

■ Although this Court has previously held that the factors enunciated by *Phoenix Piccadilly* are no longer applicable in single asset real estate cases, the Court continues to employ the *Phoenix Piccadilly* factors in multiple asset cases. *Jacksonville Riverfront,* 215 B.R. at 244; *Wells,* 227 B.R. at 561. Although the extent of Debtor's assets is unclear, it is clear that this is not a single asset real estate case.

### Claims of Unsecured Creditors in relation to the claims of Secured creditors

■ An analysis of this factor requires a comparison of the claims of secured creditors to those of unsecured creditors and thus, a preliminary determination of the amount of the IRS' secured claim. Read together, 26 U.S.C. § 6321 and 11 U.S.C. § 506(a) provide that a claim for unpaid taxes for which a tax lien has been filed by the United States is secured to the extent of a debtor's assets.[4] Debtor argues that

---

3. In *Phoenix Piccadilly,* the Eleventh Circuit Court of Appeals affirmed the district court's decision affirming this Court's dismissal of a case for cause pursuant to § 1112(b) based on the following factors:

   (i) The debtor has only one asset, the property, in which it does not hold legal title;
   (ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;
   (iii) The debtor has few employees;
   (iv) The property is the subject of a foreclosure action as a result of the arrearages on the debt;
   (v) The debtor's problems involve essentially a dispute between the debtor and the

secured creditors which can be resolved in the pending state court action; and
   (vi) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

4. 26 U.S.C. § 6321 provides in pertinent part:
   If any person liable to pay tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property, whether real or personal belonging to such person.

he has total assets of $11,416.07 and that the secured claim of the IRS is therefore $11,416.07. The IRS contends that it has been unable to determine the amount of Debtor's assets and the amount of its secured claim because of Debtor's creation of numerous sham trusts into which he placed his assets, and by his refusal to answer questions concerning the trusts. The Court makes no determination of the amount of Debtor's assets and the value of the secured claim of the IRS. Debtor's repeated transfers and concealment of his assets make such a task daunting, if not impossible. It is clear however, that Debtor has few unsecured creditors whose claims are small in relation to the claim of the IRS and the other secured creditors.[5]

### Nature of the Dispute and Timing of the Petition

Debtor's financial problems essentially involve a dispute between Debtor and the IRS which can be resolved outside of the bankruptcy court. The timing of Debtor's petition evidences an intent to frustrate the legitimate efforts of the IRS to enforce its rights. Debtor filed the petition shortly after the IRS filed a Notice of Federal Tax Lien for Debtor's 1992, 1993, and 1994 taxes.

### Covenant of Silence and the Fifth Amendment

Debtor refused to cooperate with the IRS in its discovery efforts citing a purported Covenant of Silence which allegedly prevented him from disclosing any information concerning the trusts he set up. Debtor refused to name any party with whom the Covenant was entered into. Debtor also invoked the Fifth Amendment privilege against self-incrimination as a basis for his refusal to answer questions about the trusts. Debtor's assertion of a Covenant of Silence is preposterous. With respect to Debtor's Fifth Amendment privilege against self-incrimination, the Court initially notes that it finds incredible Debtor's explanation as to how he obtained legal advice to invoke the privilege.[6]

The Court now turns to the merits of the assertion of the privilege. The protection against self-incrimination conferred by the Fifth Amendment applies in bankruptcy cases. *In re McCormick,* 49 F.3d 1524, 1526 (11th Cir.1995); *Scarfia v. Holiday Bank,* 129 B.R. 671, 675 (M.D.Fla. 1990). However, a debtor's mere statement that the requested information may tend to incriminate him is not sufficient to enable him to invoke the Fifth Amendment. *Scarfia,* 129 B.R. at 674; *In re Wincek,* 202 B.R. 161, 165 (Bankr.M.D.Fla. 1996). A debtor must offer credible reasons why answering the questions would pose a real threat of incrimination. *Wincek,* 202 B.R. at 165 (citing *In re Connelly,* 59 B.R. 421, 434–435 (Bankr.N.D.Ill.1986)). Despite the Court's repeated requests, Debtor failed to come up with any credible

26  U.S.C. § 6321 (West 2000)
11  U.S.C. 506(a) provides in pertinent part: "An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ..."
11  U.S.C. § 506(a) (West 2000)

5.  Outside of the Internal Revenue Service, Debtor listed the following debts on his bankruptcy schedules:
**Secured Claims:**
SunTerra Resorts-$8,500.00-represents a jointly owned time share in Gatlinburg Tennessee

SunTrust Bank Central Florida-$6,308.93-represents the balance due on a Ford F–150 Truck
**Unsecured Priority Claims:**
Clerk of Court of Volusia County-$2,300.00-represents past due child support
Madelyn Boughton-$700.00-represents past due alimony
**Unsecured Nonpriority Claims:**
First Union Commercial Card-$2,300.00-represents a Visa credit card
Lowe's Business Account—$190.53
Shepard, Filburn, & Goodblah-$7,300.00-represents attorney's fees incurred in dissolution proceedings

6.  *See supra,* note 2

reasons why answering the questions would pose a real threat of incrimination.[7] Debtor's assertion of the Fifth Amendment right against self-incrimination is misguided.

The Court finds that Debtor's refusal to comply with the government's discovery requests is due to his continued attempts to prevent the government from determining the value of his assets, determining the amount of its secured claim, and from collecting the amount he owes, rather than his fear of incrimination.

## CONCLUSION

■ The evidence of Debtor's bad faith in filing and maintaining this case is ample. Debtor has not paid any income taxes for the 1992–1997 tax years. Debtor set up numerous sham trusts to conceal his assets. Debtor refused to answer questions about the trusts at his deposition and at trial. Debtor purposely omitted property on his bankruptcy schedules. Debtor transferred property of the estate after the petition was filed. Based upon the foregoing factors, it is clear that Debtor filed and maintained this bankruptcy petition in bad faith and for the sole purpose of preventing the government from collecting the taxes owed. Accordingly, the Court will dismiss the case. Because the Court's dismissal of the case will render Debtor's Objection to Claim moot, the Court need not address it. A separate order of dismissal will be entered in accordance with these Findings of Fact and Conclusions of Law.

7. Court:
   And I say if you're fearful of an indictment, if you're fearful of an information, if you've received any type of letter that would indicate that, if anyone has told you that in discussions, fine, tell us that. And then the Court will make a ruling in that regard. But you just cannot sit back and say, "No I'm not going to answer that question because it may jeopardize me under the Fifth Amendment." It would be a nice thing. Everybody would do that anytime they had a case. They'd just say. "I'm not going to answer the questions."
(Tr. July 1, 1999 at 94–95.)