In re STAR TRUST, and
Trust 900, Debtors.

Bankruptcy Nos. 97–12131–
8G1, 97–12130–8G1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 18, 1999.

Daniel J. Herman, Pecarek & Herman, Chartered, Largo, FL, for debtor.

Thomas H. McLain, Jr., St. Petersburg, FL, for Republic Bank.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION REGARDING CONFIRMATION OF THE DEBTORS' PLANS OF REORGANIZATION, THE DEBTORS' MOTIONS FOR CONFIRMATION OF THE PLANS PURSUANT TO 11 U.S.C. 1129(b), THE OBJECTIONS TO CONFIRMATION BY REPUBLIC BANK, AND THE MOTIONS TO DISMISS THE CASES BY REPUBLIC BANK**

PAUL M. GLENN, Bankruptcy Judge.

These jointly administered voluntary Chapter 11 cases came before the Court

for an evidentiary hearing to consider confirmation of the Debtors' plans of reorganization, the Debtors' motions for confirmation pursuant to 11 U.S.C. 1129(b), the objections to confirmation by Republic Bank, and the Republic Bank's motions to dismiss these cases.

## Background

In April, 1988, Republic Bank loaned $399,000 to Richard Spada to acquire and renovate a 1920's two-story office building of approximately 16,000 square feet which was in derelict condition. In January, 1989, the Bank loaned $428,000 to Spada to acquire another building in the same city block, a 1920's three-story building of approximately 13,600 square feet, then a transient hotel, and renovate it into an office building. The loans were cross collateralized. There were four subsequent advances and two subsequent modifications. The first subsequent advance was in the amount of $60,000 and was in 1989; the second (of $38,872) was in 1991; the third (of $175,000) was in 1993; and the fourth (of $70,000) was in 1994. The total principal amount loaned was $1,170,872.

On March 16, 1994, a "Second Loan and Modification and Future Advance Agreement" was entered, at which time the outstanding principal balance was $1,118,365. Pursuant to the Second Loan and Modification Agreement, interest was due quarterly at the rate of 9 and 1/2%, and the total amount of the loan became due on October 5, 1997. Upon default, the maturity could be accelerated and interest became due at the highest rate allowed by law.

In addition to the mortgages on the real property, the mortgagor executed Assignments of Rents, Leases, Contracts, Accounts Receivable, Accounts and Deposit Accounts in favor of the Bank.

There is also a second mortgage on the property, dated November 13, 1990, to Geraldine Rutman, in the original principal amount of $148,100. The note contained provisions for negative amortization and

for payment of another outstanding note to Rutman, and the outstanding balance of this obligation is now approximately $200,000.

In 1991, Spada created Star Trust, and conveyed both properties to the trust. In 1992, Trust 900 was created, and the two properties were divided between the two trusts. The terms of the two trusts are identical. Spada's wife (Carla Defusco) is the beneficiary. An attorney was the initial trustee, and Spada is now the successor trustee.

In July, 1995, there was a default in the payments due to the Bank under the loan documents. Subsequently, in 1995, the Bank commenced foreclosure proceedings in the state court.

Each trust filed a voluntary Chapter 11 petition on July 23, 1997.

On July 24, 1997, the Bank obtained a Summary and Final Judgment against Spada, since Spada was obligated on the loans. The total amount of the judgment was $1,461,795.

Cash Collateral Orders were entered in these bankruptcy cases on September 19, 1997, pursuant to agreement between the Debtors and the Bank. In accordance with those orders, the Debtors were required to make monthly payments of $9,381.15, the amount of the interest on the outstanding principal balance of the loans at the contract pre-default rate of 9 and ½ percent.

On October 20, 1997, the Debtors filed their proposed plans of reorganization.

The Bank elected treatment pursuant to Section 1111(b) of the Bankruptcy Code, by a notice of such election filed on November 19, 1997.

The Bank has filed proofs of claim in each of the cases, in the amounts of $1,461,795 plus interest, costs, and attorney's fees. The Debtors filed objections to the claims.

Although the parties negotiated during the two years while the foreclosure case was pending, and also during the year and

a half of this bankruptcy case, and apparently have been close to resolution a number of times,[1] they can now agree only on the documents and background.

## Discussion

Several issues are raised in these cases: (1) are the trusts entitled to relief under the Bankruptcy Code; (2) were the cases filed in bad faith and have the plans been proposed in good faith; (3) what is the value of the property; (4) what is the amount of the Bank's claim; (4A) what was the amount of the debt on the date of the petition; (4B) what is the effect of the § 1111(b) election; (4C) how should the postpetition, preconfirmation payments be treated; (5) what are the terms of the plans; (6) are the plans feasible; and (7) are the plans fair and equitable with respect to the Bank's claims.

### 1. Business trusts.

■ Section 109 of the Bankruptcy Code provides that only a person may be a debtor. Section 101(41) defines person to include a corporation, and Section 101(9)(A)(v) defines corporation to include a business trust.

■ Cases define business trusts. In *In re Metro Palms I Trust*, 153 B.R. 922, 923 (Bankr.M.D.Fla.1993) the court distinguished between trusts created for the purpose of carrying on a business or commercial activity, and trusts created for the purpose of protecting and preserving the trust res. In *In re St. Augustine Trust*, 109 B.R. 494, 495–496 (Bankr.M.D.Fla. 1990), the court distinguished between trusts for business purposes and trusts for estate and family planning purposes. As the court stated, the inquiry must focus on the trust documents and the totality of the circumstances. *In re St. Augustine Trust*, 109 B.R. at 496. The court enumerated characteristics which distinguish a business trust, citing *Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed.

263 (1935): (1) a trust created and maintained for a business purpose; (2) title to property held by trustee; (3) centralized management; (4) continuity uninterrupted by death among beneficial owners; (5) transferability of interests; and (6) limited liability.

*Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935) was, of course, a tax case, but its reasoning is instructive. At that time, an tax was imposed on the net income of "every corporation, joint-stock company or association, and every insurance company, organized in the United States, no matter how created or organized, not including partnership." Additionally, the revenue acts provided that "[t]he term 'corporation' includes associations, joint stock companies, and insurance companies." The issue was whether the trust involved was an association and subject to income taxes.

> ... "In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains."

> ...

What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the

---

1. Most recently, the Debtors moved to enforce a settlement agreement allegedly reached during a recess in the confirmation hearing. The Court concluded that no agreement had been reached, and continued with the evidentiary hearing.

members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act 'in much the same manner as directors,' may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking.

*Id.* at 357, 358, and 359, 56 S.Ct. 289.

Spada testified that the trusts were created to develop and maintain the properties, and to rent the properties, collect rents, pay expenses, and account for the profits separately. He testified that they also were created to facilitate the transferability of beneficial interests. He testified that no estate planning purposes were considered.

The trusts contain the following statement of their purposes:

> *PURPOSE AND INTENT.* The purpose and intent of this trust is to avoid probate, facilitate the cost and ease of transfer of the property, keep property assessments down and help in the estate planning of the Grantor and/or Beneficiary.

Despite the statement that one of the purposes of the trusts is "to avoid probate," the trust agreements contain no dispositive provisions for a beneficial interest on the death of the beneficiary. Rather, the trusts specifically provide that in the event of the death of a beneficiary, the beneficial interest shall "pass to her executor or administrator and not to her heirs at law." Avoiding probate and passing an interest to an executor or administrator are simply impossible to do at the same time. It is apparent that the trusts were not created for estate planning purposes.

Spada is the trustee of each of the trusts, and his wife is the beneficiary of each. Spada's wife does not live with him, but lives in Pennsylvania. However, there was no testimony regarding family planning or personal reasons for the trusts.

As the Bank points out, the trusts have not registered with the Department of State, as required for some trusts by Chapter 609, Florida Statutes, and the trusts have not filed tax returns. These deficiencies do not mean that the trusts are not business trusts, however.

The evidence shows that the trusts were created and are maintained to hold and manage the two business properties. The position of trustee is a continuing position, with provisions for succession. The beneficial interests are transferable, with a right of first refusal in existing beneficiaries. The trusts do not terminate or distribute assets at the death of the beneficiary, but are continuing entities. The liability of the participants is limited.

It appears that the trusts were created not simply to hold and conserve the properties for the beneficiary, but to develop and maintain the properties, to rent and manage the properties, and ultimately to retain or dispose of the properties at a profit. The Court concludes that the trusts qualify as business trusts for relief under Chapter 11.

## 2. Bad faith.

The Court must determine both whether the cases were filed in bad faith, and whether the plans have been proposed in good faith.

### A. Filing of the cases.

■ Section 1112(b) provides that a case may be dismissed for cause. Courts have long recognized that bankruptcy proceedings must be brought and maintained in good faith. See *In re Victory Construction Co., Inc.*, 9 B.R. 549 (Bankr.C.D.Cal. 1981) ("Victory I") (explaining the historic development of the requirement of good faith in bankruptcy proceedings). The Eleventh Circuit Court of Appeals has confirmed that a debtor's lack of good faith constitutes cause for the dismissal of a case pursuant to § 1112(b), *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984), and also cause for granting relief from the automatic stay pursuant to § 362(d)(1). *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988). Circumstantial factors which have been identified by courts as evidencing the lack of good faith are enumerated in *Natural Land*, 825 F.2d at 298 and *Phoenix Piccadilly*, 849 F.2d at 1394. The Eleventh Circuit has always been careful to add that there is no particular test for determining whether a debtor has filed a petition in good faith, but that in finding a lack of good faith courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization process. *See Albany Partners*, 749 F.2d at 674, *Natural Land*, 825 F.2d at 298, and *Phoenix Piccadilly*, 849 F.2d at 1394, *and see In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1027 (11th Cir.1989).

Many of the more recent cases which have discussed bad faith as a cause for dismissal have arisen in the single asset real estate context. The adoption in 1994 of § 362(d)(3), which provides that a court shall grant stay relief in a single asset real estate case unless the debtor files a plan of reorganization or begins monthly payments, has prompted arguments that (1) a single asset real estate case should not be dismissed if the debtor complies with the requirements of § 362(d)(3), even though the case may have been filed in bad faith; and (2) the considerations of *Phoenix Piccadilly* are no longer applicable to assist in the determination of bad faith.

■ A review of the development of "bad faith" as cause for dismissal leads quickly to the conclusion that § 362(d)(3) does not preempt this body of law. *See Victory I*, 9 B.R. at 551–560. Moreover, a review of the provisions of § 362(d)(3) also requires the same conclusion.[2]

■ Congressional acknowledgment that Chapter 11 is available to single asset real estate debtors is expressed by § 362(d)(3), and this acknowledgment may change the emphasis of some courts on factors which indicate that cases have been filed in bad faith. *See Jacksonville Riverfront Development, Ltd.*, 215 B.R. 239 (Bankr.M.D.Fla.1997); *but see, also, In re Park Forest Development Corporation*, 197 B.R. 388 (Bankr.N.D.Ga.1996) and *In re Midway Investments, Ltd.*, 187 B.R. 382 (Bankr.S.D.Fla.1995). Courts will nevertheless continue to review the evidence to determine if there is a lack of good faith in the prosecution of the bankruptcy case, and will continue to modify the stay or dismiss cases in appropriate circumstances.

■ The cases before the Court have many of the characteristics common to single asset real estate cases: one asset; few unsecured creditors; no employees; two party dispute; and the filing of the bankruptcy petition on the eve of a critical

---

2. Section 362(d)(3) does not provide a safe harbor. The section provides that the court shall grant relief from the stay unless the debtor complies with its provisions. The sec- tion does not preempt any other basis for relief or modification of the stay. *See In re Midway Investments, Ltd.*, 187 B.R. 382, 388–89 (Bankr.S.D.Fla.1995).

foreclosure hearing. However, there is no indication of an intent to abuse the judicial process or the purposes of the reorganization provisions.[3] When resolution of the foreclosure litigation was unsuccessful, the Debtors filed these cases, began making monthly payments, and soon thereafter filed plans to restructure their debt and pay all creditors in full. The Court concludes that the cases have not been filed in bad faith, and should not be dismissed.

## B. Proposal of the plan.

Section 1129(a)(3) provides that the court shall confirm a plan only if it has been proposed in good faith. The requirement of good faith in the proposal of a plan has generally been interpreted as requiring "that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir.1995), citing *In re Block Shim Development Company–Irving*, 939 F.2d 289 (5th Cir.1991) and *In re Madison Hotel Associates*, 749 F.2d 410 (7th Cir.1984). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied." *In re McCormick*, 49 F.3d at 1526. "The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan, ... keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *Id.*

Through the plans, the Debtors propose to pay all creditors in full. The Debtors have modified the plans to eliminate a provision preventing acceleration upon default and to eliminate a release price provision, two provisions which were objectionable to the Bank. The Debtors and Spada have agreed that Spada will continue to manage the properties, and that he will do so without compensation until payments under the plans have been completed. The Debtors have also agreed with the construction company controlled by Spada that it will continue to perform the maintenance on the properties, and that it will do so at cost until payments under the plans have been completed. The Debtors further stated that they would modify the plans in any other manner needed, if possible, to qualify for confirmation.

The Court concludes that the plans have been proposed in good faith, and the requirement of § 1129(a)(3) is satisfied.

## 3. Value of the property.

The Bank's expert appraiser testified that the property has a value "as is" of $1,250,000, and that the stabilized value of the property is $1,640,000.

The Debtors' expert appraiser testified that the property has a value "as is" of $1,790,000, and that it has a stabilized value of $1,889,000.

The current appraisal for ad valorem tax purposes is $767,100.

The original purchase prices of the properties in 1988 and 1989 aggregated $510,000. There has been substantial rehabilitation of the properties since their purchase, and the total loans extended by the Bank aggregate $1,170,000.

The properties are in the "Dome District" of St. Petersburg. The district is on the fringe of the St. Petersburg downtown area. The Dome houses entertainment facilities and a baseball field, and a major league baseball team has just completed its first season with the Dome as its home

**3.** "The *Phoenix Piccadilly* factors are a guide for the exercise of the bankruptcy court's discretion and in and of themselves do not require dismissal.... '[T]he real test that still remains is the presence of honest intention of the Debtor and some real need and real ability to effectuate the aim of the reorganization....' " *In re Park Forest Development Corporation*, 197 B.R. at 394 (quoting *In re North Redington Beach Assocs., Ltd.*, 91 B.R. 166, 169 (Bankr.M.D.Fla.1988)).

stadium. The experts testified that the district is better suited for retail businesses than for offices.

The property is not increasing rapidly in value. With major league baseball came many hopes for the area, but those hopes have not yet materialized. The experts do agree that property in the area is generally holding its value, however, and is not decreasing in value. The city is improving the streets and public areas in the district.

The properties owned by the Debtor are older buildings, built in the 1920's, which have been renovated. They are not particularly large, a total of approximately 30,-000 square feet. Their appearance is satisfactory, and the experts describe them as "B/C" properties. The parking at the properties is limited. The State Department of Corrections is one of the tenants in one of the buildings, and a parole and probation office is located there. There is a bar between the properties which is described as "a blue collar bar and not a baseball bar."

After reviewing the appraisals and considering the testimony, the Court concludes that the current value of property is $1,250,000. The Bank's expert is well qualified, credible, and his opinion of the value of the property is reasonable and is consistent with the other factors brought out in the testimony.

### 4. Amount of the claim.

A determination of the amount of the claim which must be paid through the plan requires consideration of the amount of interest which has accrued on the debt. In this case, consideration must be given to the accrual of interest prepetition (prepetition interest), the accrual of interest during the pendency of the case from the filing of the petition to the confirmation of the plans (pendency interest), and the accrual of interest following confirmation while the claim is being paid under the provisions of the plans (plan interest). Considerations of the accrual of interest are critical in this case.

### A. Debt on the date of filing the petitions.

Determining the amount of the claim begins with a determination of the amount of the debt on July 23, 1997, when the petitions were filed. Consideration must be given to the amount of prepetition interest, and whether prepetition interest is properly determined at the contract default rate.

Section 502(b) provides that the court shall determine the amount of a claim as of the date of the filing of the petition and shall allow such claim except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; and (2) that such claim is for unmatured interest. Other exceptions are not applicable in this case.

The cases were filed on July 23, 1997. On July 24, 1997, the Bank obtained a "Summary and Final Judgment" against Richard Spada in the amount of $1,461,795. Spada is obligated on the debts which are secured by the mortgages. Because the Debtors filed their petitions on July 23, 1997, the Bank was stayed from obtaining a judgment against the Debtors. The Debtors are correct in their argument that the judgment does not establish the Debtors' obligations by the principle of collateral estoppel. However, the judgment does evidence facts regarding the debt which are undisputed and which are corroborated by other testimony. An officer of the Bank testified regarding the amount of the debt, and the calculations are shown in the Bank's exhibits. Spada testified that: "To me, it's the same debt." The Bank's representative testified that the debt owed by Spada is the same debt as is owed by the Debtors.

It is clear from the evidence that the total amount of the debt on July 24, 1997, was $1,461,795. The evidence shows that

the principal balance of the debt on July 24, 1997, was $1,184,988. The accrued interest on that date was $438,283, computed at the contractual default rate of interest. Payments made prior to the date of the judgment include payments of $149,247, as shown in an affidavit filed in the State Court proceeding, and additional payments of $30,000, as shown in the State Court judgment. Other costs due under the notes were $1,585, and attorney's fees due under the notes were $16,186. The total amount due on July 24, 1997, was $1,461,795.

To determine the debt due on July 23, 1997, the judgment amount must be reduced by the amount of interest for one day. Daily interest in determining the judgment amount was computed at the rate of 18 percent, the contract rate after default, or $584 a day. Reducing the state court judgment by $584 results in the amount of the debt on July 23, 1997, which is $1,461,211.

■ This conclusion necessarily means that the interest due from default until the petition date, the prepetition interest, has been determined at the default rate of interest provided by the notes. This determination is appropriate for several reasons.

First, it is the result obtained pursuant to the Bankruptcy Code. Section 502 provides that the court shall determine the amount of the claim as of the date of the filing of the petition, and shall allow such claim except to the extent that several exceptions apply. One of those exceptions is that the claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. 11 U.S.C. § 502(b)(1). The default rate of interest provided in the agreement is not unenforceable against the debtor or property of the debtor. It is allowed under Florida law, and the State Court has, in fact, enforced that rate of interest against Spada.

Accordingly, it is not excluded under § 502(b)(1).

Another exception is contained in § 502(b)(2), which provides that a claim is not allowed to the extent that it is for unmatured interest. However, none of the interest which accrued prepetition is unmatured. Accordingly, under § 502 the prepetition interest should be allowed at the default rate provided in the contract.

In *In re Pinebrook, Ltd.*, 92 B.R. 948 (Bankr.M.D.Fla.1988), the court found that the default rate of interest is appropriate prepetition, stating that such a provision is a valid and enforceable right under Florida law. The court added that there was no evidence of overreaching or other equitable grounds which would justify the court's exercising its discretion to refuse to enforce such a clause.

The Tenth Circuit Court of Appeals in *In re Pikes Peak Water Company*, 779 F.2d 1456, 1459 (10th Cir.1985) very briefly but clearly states that the application of default rate interest was reasonable and would not be set aside.

■ "Few cases discuss the rate of prepetition interest, but it is accepted that applicable nonbankruptcy law determines not only the right to, but also the rate of prepetition interest.... Under the general rule stated above, a claim for prepetition interest would be allowed at a higher default rate if that would be the result outside of bankruptcy." Dean Pawlowic, *Entitlement to Interest under the Bankruptcy Code*, 12 BANKR.DEV.J. 149, 153 (1995).

Section 506(b), which allows interest, costs, and fees to oversecured creditors only, is not applicable to the prepetition claim, but applies from the date of filing through the confirmation date. *In the matter of T–H New Orleans Limited Partnership*, 116 F.3d 790, 797 (5th Cir.1997) citing *Rake v. Wade*, 508 U.S. 464, 468, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). The prepetition claim is determined other than under section 506.

Accordingly, the contract default rate of interest is the appropriate rate of interest to apply prepetition, and is used to determine the appropriate amount of the debt on the date of filing.

## B. Treatment pursuant to § 1111(b)(2).

Section 506(a) provides that an allowed claim of a creditor secured by a lien on the debtor's property is secured to the extent of the value of the creditor's interest in the estate's interest in the property, and unsecured for the balance.

Section 1111(b) provides that a class of which a secured claim is a part may elect treatment under section 1111(b)(2), and if such an election is made, then notwithstanding section 506(a), the claim is a secured claim to the extent that the claim is allowed.

Since the class of which the Bank's claim is the only member has elected treatment under § 1111(b)(2), the Bank's claim shall be considered a secured claim to the extent that the claim is allowed.

## C. Postpetition payments.

Pursuant to the agreed Cash Collateral Order, the Debtor was required to pay $9,381.15 on the 5th day of each month beginning September 5, 1997. The payments were in the amount of interest on the outstanding principal balance of the loans at the contract pre-default rate. From September 5, 1997, through January 5, 1999, 17 payments have been made for a total amount of $159,480.

Section 506(b) provides that "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

Although the election for treatment pursuant to § 1111(b)(2) results in the claim being considered secured to the extent that it is allowed, the allowed secured claim is nevertheless secured by property the value of which is not greater than the amount of the claim. By its terms, § 1111(b)(2) operates notwithstanding § 506(a); however, the provisions of § 506(b) remain applicable and its principles must be applied.

Under § 506(b), postpetition interest may be allowed when the value of the property securing a claim is greater than the amount of the claim; however, postpetition interest may not be allowed when the value of the property securing the claim is not greater than the amount of the claim. These principles of § 506(b) are discussed in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), and *Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

The amount of the debt on the date of the filing of the petition was $1,461,211. The claim is secured by property which has a value of $1,250,000. While no expert expressed an opinion of the value of the property as of the date of filing, the evidence indicates that the property in the district is not decreasing in value, and is not appreciating rapidly in value. The occupancy levels and the general condition of the Debtors' property have been approximately the same since the case was filed. The Court concludes that the value of the property securing the claim has not increased or decreased materially since the cases were filed. The Bank's claim cannot accrue interest during the period between the filing of the cases and confirmation of the plans, as long as the value of the property securing the claim is not greater than the amount of the claim.[4]

4. "Even more important for our purposes    than § 506's use of terminology is its substan-

Section 362(d)(3) does not require a different result. Section 362(d)(3) provides that the court shall grant stay relief unless the debtor has commenced monthly payments to each creditor whose claim is secured by the real estate, which payments are "in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate." The section does not state that the debtor shall make monthly payments "of interest" at a current fair market rate on the value of the creditor's interest in the real estate, but it requires that the Debtor make monthly payments "in an amount equal to interest" at a current fair market rate on the value of the creditor's interest in the real estate. The payments must be accounted for as bankruptcy law would otherwise require.

In this case, the rents from the property were also pledged to secure the debt. Section 552(b)(2) provides that the Bank's security interest extends to rents acquired postpetition. The treatment of the Debtors' postpetition payments to the Bank in this case is not affected by the fact that the rents are cash collateral, however. The fact that the rents are cash collateral establishes the Bank's rights to the rents.[5] If the rents had not been paid to the bank, or if the rents had been segregated, the value of the property securing the claim would have increased.

Section 361 does not require a different result in this case.

Since interest cannot accrue on the claim, and since the value of the property has not increased or decreased materially since the cases were filed, the payments made to the bank must be applied to reduce the amount of the claim. If the payments had reduced the amount of the claim to an amount less than the value of the collateral, then interest would have accrued. If the value of the collateral had increased to exceed the amount of the claim, interest would have accrued. However, in this case interest has not accrued because application of the payments to the claim has not reduced the amount of the claim to an amount which is less than the value of the collateral, and the value of the collateral has not increased to the extent that the value exceeds the amount of the claim.

There are few discussions of the treatment of postpetition payments. Many of the discussions are in the context of claims which are bifurcated under § 506(a). *IPC Atlanta Limited Partnership,* 142 B.R. 547 (Bankr.N.D.Ga.1992) discusses the application of post petition payments in a case where an 1111(b)(2) election had been made, and reaches a similar conclusion. *See, also,* Dean Pawlowic, *Entitlement to Interest under the Bankruptcy Code,* 12 BANKR.DEV.J. 149, 155–168 (1995).

Accordingly, the postpetition payments of $159,480 from the Debtors to the Bank must be applied to reduce the claim from $1,461,211 to $1,301,731, and the amount of the allowed secured claim at the time of confirmation is $1,301,731.

### 5. Terms of the Plans.

In the plans, the Debtors propose to pay the allowed amount of the secured claim in monthly payments based on a 20-year amortization at 9 ½ percent interest, with a 3 year maturity.

---

tive effect of denying undersecured creditors postpetition interest on their claims—just as it denies over secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral.... Since this provision permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest." *Timbers of Inwood Forest,* 484 U.S. at 372–373, 108 S.Ct. 626.

**5.** "Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors." *Timbers of Inwood Forest,* 484 U.S. at 374, 108 S.Ct. 626.

The Bank objects to the inclusion of the prepetition costs and fees in the amount of the debt, indicating that it would not refinance these types of charges. However, these items are components of the allowed amount of the claim, and the Code clearly provides that the Debtors may pay the allowed amount of the claim pursuant to the plan.

The allowed amount of the secured claim is $1,301,731. For a 20–year amortization at 9 ½ percent, the monthly payments are $12,133.84, and after three years, the outstanding principal would be $1,225,912.

Pursuant to section 1127(a), the proponent of a plan may modify a plan before confirmation. The Debtors have modified the plans to eliminate a provision preventing acceleration upon default and to eliminate a release price provision. Also, the Debtors have agreed with Spada that he will continue to manage the property, and he will manage the property without compensation until payments under the plans have been completed. Additionally, the Debtors have agreed with the construction company of which Spada is the president that it will continue to maintain the property, and will do so at cost until payments under the plans have been completed. The Debtors further stated that they would modify the plans in any other manner needed, if possible, to qualify for confirmation.

## 6. Feasibility.

The Court must find that confirmation is not likely to be followed by a liquidation or the need for further reorganization. 11 U.S.C. § 1129(a)(11).

"There is certainly no guarantee of a successful reorganization in this case, but the Bankruptcy Code does not require such a guarantee.... [T]he Court will look to see whether the Debtor can realistically carry out the provisions of the plan, and whether the plan offers a reasonable prospect of success." *In re IPC Atlanta Limited Partnership,* 142 B.R. 547, 559–60 (Bankr.N.D.Ga.1992).

The Debtors' recent circumstances have not been stable. The City of St. Petersburg was a major tenant, but moved out of the Debtors' buildings four years ago. Since that time, the Debtors' buildings have not been fully occupied. Recently, a small tenant has moved out, and another tenant is scheduled to move out in March, 1999. Spada testified that a new tenant is moving in immediately, and that another may move in shortly. The Bank points out that these tenants are not in occupancy, and that there may be costs of tenant improvements for these and other new tenants. Much of the testimony regarding the immediate future is speculative.

To assess feasibility, the Court looks to the actual operating results since the filing of the petitions. Actual income, annualized, has been $248,642, and actual expenses, annualized, have been $235,804. The resulting annual net income has been $12,838.

To demonstrate that the plans are feasible, the Debtors begin with the actual annual income and show the adjustments, on a pro forma basis, for payments which they will not be required to make after confirmation. The Debtors show that the net income figure above would be increased by the payments which were made to the Bank, other mortgage holders, and tax escrows. The Debtors also show that this would be increased by the amount of the compensation paid to Spada, since he has committed to manage the properties without compensation, and by an amount which represents the profit to Spada's construction company for maintenance, which it has committed to forego. The Debtors also add back the U.S. Trustee's fees, but that is not an appropriate addition since these fees continue to be due after confirmation. After these pro forma adjustments, according to the Debtors, the net operating income available for plan pay-

ments would be $182,170 annually, which is $15,180 a month.

From the resulting amount, the Debtors must make the plan payments. The Debtors must pay the Bank the monthly amount of $12,134; a postpetition tax escrow of $1,600; prepetition tax payments of $360; and the Rutman mortgage. Mrs. Rutman has committed to accept $750 as her monthly payment rather than $1,500, if such accommodation is necessary. The required plan payments total $14,844 monthly. Net income accumulated since the filing will allow the payment of administrative expenses, and the pro-forma cash flow demonstrates that the plan payments can be made.

In evaluating feasibility, the Court must also consider the three year maturity, and whether refinancing or resale is feasible. The experts testified that the properties in the district will not decrease in value, so the Bank's current status is reasonably assured. The experts also testified that if the property is fully rented and stabilized, it will increase significantly in value. The Bank's appraiser testified that the stabilized value of the property is $1,640,000, and the Debtors' appraiser testified that such stabilized value is $1,889,000. The opinion of the Bank's appraiser is the better opinion. With a stabilized value of $1,640,000, and with the balance of the debt at maturity in three years of $1,226,-000, the debt will be approximately 75% of the value, and the cash flow will have improved. All experts testified that loans are available under these conditions.

The Court concludes that the plan is feasible.

## 7. Fair and equitable.

All of the applicable requirements of § 1129(a) are met except the requirement of § 1129(a)(8), since the Bank has not accepted the plan and is impaired under the plan. The Debtors have requested that the Court confirm the plan notwithstanding the requirements of § 1129(a)(8), pursuant to § 1129(b). The Court must do

so if the plan does not discriminate unfairly, and is fair and equitable, with respect to the Bank's claim. There is no indication that the plan discriminates unfairly.

The test of whether a plan is fair and equitable under § 1129(b) with respect to a class of secured claims is contained in § 1129(b)(2)(A). There are three subsections of § 1129(b)(2)(A), and they are set out in the disjunctive. If any of the subsections is satisfied, the test is met. In this case, the Court looks to subsection 1129(b)(2)(A)(i) to determine if the plan is fair and equitable.

Subsection 1129(b)(2)(A)(i) provides that, with respect to the class of secured claims, the plan must provide (1) that the holders of such claims retain the liens securing their claims, to the extent of the allowed amount of the claims; and (2) that a holder of a claim receive on account of such claim deferred cash payments (a) totaling at least the allowed amount of such claim, and (b) of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in the property.

There is a distinction between the two payment criteria set out in subsection 1129(b)(2)(A)(i). The secured creditor must receive deferred cash payments totaling at least the allowed amount of the claim, so in this case the Bank must be paid cash over time that totals at least the allowed amount of the Bank's claim, $1,301,731. The plan satisfies this test by paying at least the allowed amount of the Bank's claim over a period of time. Additionally, the payments must be of a value as of the effective date of the plan of at least the value of the holder's interest in the estate's interest in the property. The property is valued at $1,250,000, so the payments to be received by the Bank must have a value as of the effective date of the plan of at least $1,250,000.

Since the Bank has elected treatment pursuant to § 1111(b)(2), the Bank's claim of $1,301,731 is treated as a secured claim;

however, the Bank's interest in the estate's interest in the property is the value of the property, which is $1,250,000. For fair and equitable treatment, therefore, the plan must provide that the Bank receive payments totaling at least $1,301,731, which have a value as of the effective date of the plan of at least $1,250,000. *See* 7 *Collier on Bankruptcy* ¶ 1129.05[2][a][i] [Parsing the Statute] and ¶ 1129.05[2][a][i][B] [Section 1111(b) Election Made] (15th ed.1998).

■ The determination that the deferred payments to be made pursuant to the plan must have a particular value as of the effective date of the plan leads to the considerations of plan interest.

Although the entitlement to plan interest invites little argument, the rate of plan interest threatens never to be resolved. With little exaggeration, one commentator notes that there is a case for almost any method of determining the appropriate rate, [footnote omitted], and he identifies eight "major" lines of authority among the cases that address this issue. [Footnote omitted]. A few generalizations, however, have emerged from the chaos....

[E]ach of the eight circuits that has addressed the issue of the appropriate rate of plan interest has concluded that *plan interest must reflect, in some fashion, a current market rate of interest on a loan with duration and risk characteristics similar to those of the deferred payments proposed under the plan.* [Footnote omitted]. Although various methods for determining what is the appropriate current market rate have been approved or prescribed by these courts, most have compared the deferred payments proposed under a plan to a coerced loan from the creditor, to whom a market rate of interest must be paid in order to make the coerced loan equivalent to payment of the same principal amount as of the effective date of the plan. [Footnote omitted].

Dean Pawlowic, *Entitlement to Interest under the Bankruptcy Code*, 12 BANKR. DEV.J., 149, 173–75 (1995). (Emphasis supplied.) *See, also*, 7 *Collier on Bankruptcy* ¶ 1129.06[1] [Present Value] (15TH ED.1998).

The Eleventh Circuit Court of Appeals has set out the tests to be used in this circuit. In *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983), cert. denied 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680, the Court considered the phrase "value, as of the effective date of the plan." Although consideration was in the context of subsection 1129(a)(9)(C), the Court noted that the phrase appears in several other subsections of § 1129 as well as in Chapter 13, and applies to a wide variety of claims. *Southern States*, 709 F.2d at 652 n. 6.

The Bankruptcy Courts have almost uniformly ruled that the proper method of providing such creditors with the equivalent of the value of their claim as of the effective date of the plan is to charge interest on the claim throughout the payment period.

. . .

The factors relevant to determining an appropriate interest rate are succinctly summarized in 5 Collier on Bankruptcy ¶ 1129.03, at 1129–65 (15th ed.1982):

The appropriate discount [interest] rate must be *determined on the basis of the rate of interest which is reasonable in light of the risks involved.* Thus, in determining the discount [interest] rate, *the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.*

. . .

We believe Congress intended that creditors required to accept deferred payments pursuant to § 1129(a)(9)(C) [which also requires the creditor receiv-

ing deferred cash payments to receive payments of a value, as of the effective date of the plan, equal to the allowed amount of the claim] should be *placed in as good a position as they would have been had the present value of their claims been paid immediately.*

*Id.,* at 650–52. (Emphasis supplied).

■■■ Accordingly, the interest rate must be a rate of interest which is reasonable in light of the risks involved, and the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default. The Court should attempt to place the secured creditor in as good a position as it would have been had the present value of its claim been paid immediately.

In most cases, there will be evidence of *relatively comparable* transactions. In other cases, the plan's extreme terms or the debtor's extreme credit history will require that the bankruptcy court derive an interest rate from a combination of some base rate and an additional risk factor. And, in still other cases, bankruptcy courts may conclude that the rate in the contract is the most credible evidence of what the secured creditor would have earned had it been paid a cash amount equal to the value of its secured claim and reinvested that cash in a loan comparable to the terms and risks presented by the debtor's plan.

David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates,* 49 ALABAMA L.REV. 435, 468 (1998). (Emphasis in original).

Testimony regarding interest rates was given by four financial experts. The Bank's prime rate of interest is 7 3/4. All experts indicated that the current market rates for commercial real estate loans with 20 year amortizations, 10 year maturities, between 70 and 80 percent loan to value ratios, and 1.2 to 1 debt service coverage ratios are between 8 and 9 percent. There was no testimony regarding higher rates.

There are a number of factors in this case which require a rate higher than the rates indicated above. The loan does not meet the 80% loan to value ratio at this time, nor does it have a 1.2 to 1 net income to debt service coverage ratio. Higher supervision costs will be involved with this loan. Additionally, an officer of the Bank testified that because of the status of the loan, the Bank has been required by regulators to establish a contingency reserve of 20 percent of the outstanding principal balance. That amount is approximately $240,000. While such a reserve may not preclude the Bank from employing the assets against which the reserve is established, the reserve is a liability on the books of the Bank and when established was a decrease in earnings. Although there is no evidence of the effect of the decrease in earnings when the reserve was established or the continuing effect of the reserve, it nevertheless had and continues to have a negative effect. Accordingly, none of the rates in the 8 percent range are appropriate.

The Debtors have proposed to pay interest at the rate of 9 ½ percent on the allowed secured claim. It should be noted that the effective rate interest on the value of the collateral is actually higher than 9 ½ percent. As discussed above, the payments must be of a value as of the effective date of the plan of the value of the collateral ($1,250,000). Since the 9 1/2% rate will be paid on the allowed amount of the claim ($1,301,731), the effective rate on the value of the collateral ($1,250,000) is greater than 9 1/2%.

The Court concludes that the rate proposed by the Debtors is reasonable in light of the risks involved. The Court concludes that the rate reflects a reasonable rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

For a similar analysis in a case involving a creditor which had elected treatment

under § 1111(b)(2), see *In re IPC Atlanta Limited Partnership*, 142 B.R. 547 (Bankr. N.D.Ga.1992).

The Court concludes that the plans are fair and equitable.

### Conclusion

For the reasons expressed above, the Court concludes that the Debtors' motions for confirmation of the plans pursuant to 11 U.S.C. § 1129(b) should be granted, the Bank's objections to confirmation should be overruled, the Bank's motions to dismiss should be denied, and the Debtors' Plans of Reorganization, as modified, should be confirmed. The modifications to the plans of reorganization made by the Debtors at the confirmation hearing, that is, the elimination of the provisions preventing acceleration upon default and the elimination of the release price provisions, shall be included in the confirmation order. Except as modified by the terms of the plans, the loan documents shall remain in full force and effect. Specifically, the loans may be accelerated if a payment default is not cured within 10 days of written notice, and if a nonpayment default is not cured within 30 days of written notice. Spada shall continue to manage the properties, and the Debtors shall not compensate Spada for his management services. Bay Crest Construction Co. shall continue to maintain the properties, and the Debtors shall pay only the actual costs of such maintenance. By making these representations in court, Spada and Bay Crest Construction Co. have submitted to the jurisdiction of this court. The state court foreclosure action may remain pending, and the Bank may continue with the action to the extent necessary so that it will be able to obtain a final judgment of foreclosure if there is a default. The Court shall retain jurisdiction to the extent necessary to enforce these provisions.

The Court will enter a separate order consistent with this memorandum opinion.