In re BALBOA STREET BEACH
CLUB, INC., Debtor.

No. 04–25508–BKC–RBR.

United States Bankruptcy Court,
S.D. Florida,
Ft. Lauderdale Division.

Jan. 5, 2005.

Ivan J. Reich, Ft. Lauderdale, FL, for debtor.

*MEMORANDUM OPINION AND ORDER DENYING ANTHONY JAMES DEVELOPMENT, INC.'S MOTION (I) TO DISMISS CHAPTER 11 CASE; (II) ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY; AND (III) TO IMPOSE SANCTIONS (C.P. # 16)*

RAYMOND B. RAY, Bankruptcy Judge.

THIS CAUSE having come before this Court upon a final evidentiary hearing on November 17, 2004 on Anthony James Development, Inc.'s ("AJD") motion to dismiss Debtor/Debtor-in-possession, Balboa Street Beach Club, Inc.'s ("Balboa") Chapter 11 case; alternatively, for relief from the automatic stay, and to impose sanctions (C.P.# 16), and the Court, having taken testimony from the principals of both Balboa and AJD, having reviewed the case and statutory law, having taken judicial notice of the records of the County, and of this and other courts, having considered the evidence presented, having reviewed the parties memorandum, opening statements, and other submissions made to this Court, having heard argument of counsel, and being otherwise duly apprised in the premises, hereby makes the following finding of facts and conclusions of law:

## FINDINGS OF FACT

### Procedural History Since the Petition Date

1. On September 2, 2004 (the "Petition Date"). Debtor/ Debtor in Possession Balboa filed its Petition for Relief under Chapter 11 of the Bankruptcy Code, along with its Schedules and Statement of Financial Affairs (collectively the "Schedules") (C.P.# 1), which Schedules were amended on November 17, 2004 (C.P.# 51). Amongst Debtor's listed assets were three undeveloped beachfront parcels of land located in Hollywood, Florida, along with the right to apply for a seawall permit on the subject property.

2. On September 10, 2004, Balboa, as Debtor in Possession, moved to reject its executory contract with AJD under 11 U.S.C. § 365(a) and Bankruptcy Rule 6006. (C.P.# 4), to which AJD filed its response on October 4, 2004 (C.P.# 17), and to which Balboa replied on October 27, 2004 (C.P.# 28).

3. On October 1, 2004, AJD moved to dismiss Balboa's Chapter 11 case, for stay relief and for sanctions (C.P.# 16), to which Balboa responded on November 12, 2004 (C.P.# 34).

4. This Court shall defer its ruling on the Motion to Reject Executory Contract until after this Court issues its ruling on AJD's Motion to Dismiss, for Stay Relief, and for Sanctions.

5. Debtor's Schedules reflect Capital Crossings Bank (the "Bank"), its mortgagee, and the City of Hollywood (the "City"), as its secured creditors. Debtor listed AJD as a contingent, non liquidated, and contested unsecured creditor. Debtor also listed its principal, Jim Thompson's wife, Tamara Williams, as an unsecured creditor by virtue of mortgage payments she made to the Bank over the life of the loan, and litigation expenses she fronted for the Debtor over the years.

6. On September 29, 2004, Broward County's Revenue Collection Division (the "County") filed its secured Proof of Claim for unpaid real estate taxes for $9,685.13. (P.O.C. # 1).

7. On October 4, 2004, the City of Hollywood (the "City") filed its secured Proof of Claim for demolition liens for $39,790.99. (P.O.C. # 2).

8. Pursuant to the prehearing order Balboa filed the Declaration of its princi-

pal, Jim Thompson (C.P.# 39). In addition to said Declaration, Mr. Thompson was called as a witness and submitted himself to direct examination by counsel for AJD, and was cross examined by Balboa's counsel, at the hearing on November 17, 2004.

9. AJD filed the Amended Declaration of its principal, Anthony J. Rotunde (C.P.# 53). In addition to said Declaration, Mr. Rotunde was called as a witness and submitted himself to direct examination by counsel for AJD, and was cross examined by Balboa's counsel, at the hearing on November 17, 2004. Messrs. Thompson and Rotunde were the only two witnesses who testified on November 17, 2004.

10. At the evidentiary hearing on November 17, 2004, Debtor objected to and moved to strike that portion of Mr. Rotunde's Declaration not based upon his own personal knowledge and merely derived from reading a transcript of the state court hearing in this matter (Transcript of November 17, 2004 hearing, pg. 36, line 10 through pg. 40, line 9), and the various orders entered by the state circuit and appellate courts (Transcript of November 17, 2004 hearing, pg. 40, line 12 through pg. 42, line 3). This Court hereby sustains that objection and grants Debtor's motion to strike that testimony from Rotunde's Declaration. All testimony from the fourth sentence of Paragraph 3 onward as well as the first sentence of Paragraph 4, all testimony from the second sentence of Paragraph 9 onward, as well as all of Paragraphs 10, 11, and 12 is stricken. Those court rulings and hearing transcript speak for themselves. (Exhibits D, F, and G).

11. On November 17, 2004, Debtor Balboa filed its request with this Court to take judicial notice of documents in the public record of Broward County, and in the court records of this Court, the Circuit Court in and for Broward County Florida, and Florida's Fourth District Court of Appeals (C.P.# 49), and the Court hereby takes judicial notice of the same.

### Factual Findings

1. Jim Thompson is the 100% owner and sole Director of Balboa. Debtor has no officers, and no employees other than Mr. Thompson and his wife, Tamara Williams, neither of which received a salary or any monies from the Debtor.

2. Debtor's sole asset is a raw piece of land located at 5914 N. Surf. Rd., Hollywood, FL 33019–4601. The subject property consists of three undeveloped raw beachfront lots on North Hollywood Beach first bought by the Debtor in August 1991, and which then contained an operating 10 unit apartment building. Mr. Thompson testified that he and his wife originally intended to renovate and convert the apartment building to a 10 unit beachfront boutique hotel, which would serve as the basis for Mr. Thompson and his wife's retirement. After it was purchased, Mr. Thompson and his wife lived on the Property and collected rents from the tenants. Eventually, Debtor began to evict tenants as it began its plan to convert and renovate the property. In August 1992, during the renovation period, Hurricane Andrew struck and severely damaged the subject property, including both the building structure and the existing seawall. In order to complete those renovations, and repair the damage to the property, Debtor secured and executed a loan with the Small Business Administration ("SBA") on March 10, 1993 for $307,100.00; which loan was subsequently modified and increased on May 8, 1996. The SBA loan was then secured on June 4, 1993 with (1) a mortgage on the subject property, and (2) a personal guaranty from Mr. Thompson's

wife, which guarantee was modified again on May 10, 1996, when the loan amount was increased. On or about August 22, 2001, SBA assigned the Note and Mortgage to Capital Crossing Bank (the "Bank").

3. In January 1998, while Debtor was seeking to resolve parking and zoning issues related to developing the subject property, the City of Hollywood (the "City") claimed the property was an unsafe structure and began seeking to demolish the apartment building. Debtor legally fought the City's planned demolition, and eventually lost to the City which in turn demolished the property. The Proof of Claim filed on October 4, 2004 has asserted demolition liens against the Property in the sum of $39,790.99, with priority over the lien of the Bank's mortgage (P.O.C. # 2).

4. Storm damage which caused a breach in the already weakened seawall led to the eventual demolition of the seawall on the property as well. When Debtor applied for the seawall permit it was advised by the Florida Department of Environmental Protection ("DEP") that while it would be granted, it would be granted with a 20 foot set back, and 45 degree angle cutoff on the northern piece of the property. While such a permit allowed for building on the property, it limited the shape and size of what could be built on the property. Debtor appealed that decision because it wanted a seawall to be built on its original blueprint. The appeal is presently pending before an administrative judge with the State of Florida Division of Administrative Hearings. Additionally, the Beach Defense Fund, Inc. ("Beach Defense"), a community group whose purpose is to stop all future development on Hollywood Beach also intervened to stop the issuance of the permit all together. Those cases have been consolidated and are pending in the state court under Case Nos. 99–4561 and 02–2544.

5. On March 19, 1999 (subsequently amended on both April 22, 1999 and May 3, 1999) Debtor entered into a contract for the sale of the property with AJD for the purchase price of $600,000 (the "AJD Contract"). AJD's principal is Anthony J. Rotunde ("Rotunde"). The AJD Contract is the subject of a pending motion by Balboa to reject it as an executory contract that is burdensome to the estate.

6. Shortly after the execution of the AJD Contract in 1999, AJD sued the Debtor, and Debtor counter sued, and the parties have spent the last 5 years in expensive, drawn out, and protracted litigation over the parties performance under the AJD contract.

7. After a non-jury trial, held on August 27–28, 2001, the state court entered an order on February 7, 2002, which required Debtor to sell the property to AJD "as is", and assign its appellate rights to AJD, for $600,000, as well as requiring AJD to cover half of the carrying costs on the Property. To this day, AJD has never closed, on the subject property.

8. AJD appealed the February 7, 2002 judgment, and on June 2, 2004, the state appellate court reversed the trial court's ruling, and reversed and remanded the case to the trial court for an order consistent with its ruling.

9. On July 6, 2004, following the appellate court's reversal of the earlier judge's ruling, a new state court judge entered an order. This Order, which was never recorded, also indicated that if AJD wanted to prevent Balboa from selling the property, then it needed to post a $600,000 bond, which AJD never posted. Thereafter the trial court entering an Order on August 11, 2004 dissolving the two lis pendens AJD had previously placed upon the property.

10. The parties continued to litigate in both the state trial court and the state appellate court.

11. Mr. Thompson, testified that it was Debtor's intention to file this bankruptcy for a legitimate purpose: to wit—to reject the overly burdensome contract with AJD, so as to allow the property to be sold free and clear, and "as is" if possible, for the highest and best value in order to pay off the legitimate creditors of Debtor, and hopefully also generate a return to equity. This Court accepts Debtor's reasons for filing as legitimate, and finds that its filing was made in good faith.

12. The record before this Court has established that at the time of filing both the Petition and the rejection motion, (1) neither a seawall or building permit had been issued, (2) the litigation with the Beach Defense Fund had not taken place, (3) AJD had not paid Debtor the $600,000 to close, (4) record title had not transferred from Debtor to AJD, (5) AJD had not posted the bond the state court required in order to prevent the sale of the property, (6) AJD's lis pendens on the property had been dissolved by state court order, (7) the state court order requiring Debtor to assign its seawall appellate rights had not been recorded, (8) that same order was not final due to pending motions for rehearing and an appeal filed by AJD, and (9) that AJD has not paid Debtor any consideration for those appellate rights.

### CONCLUSIONS OF LAW

■ 1. Despite the 1994 Amendments to the Bankruptcy Code allowing for the filing of a "single asset real estate case," 11 U.S.C. § 101(51B), this Court is mindful that when considering a motion to dismiss a Chapter 11 Petition for having been filed in bad faith, this Court must still follow the factors enunciated by the Elev-

enth Circuit in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988). Yet these factors are "a non-exhaustive list . . . . . [from] which a court may consider in deciding whether to dismiss a debtor's case as a bad faith filing." *In re Midway Invs.,* 187 B.R. 382, 387–388 (Bankr. S.D.Fla.1995); *In re State Street Houses, Inc.,* 356 F.3d 1345 (11th Cir.2004). So in deciding a motion to dismiss for having been filed in bad faith, the Court must decide it on a case by case basis.

■ 2. AJD suggests to this Court that the timing of Balboa's filing, coupled with Balboa's motion to reject the executory contract with AJD, evidences an intent to delay or frustrate the legitimate efforts of AJD in enforcing its rights. However, there is no such thing as "bad faith" in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract. *In re Marina Enterprises, Inc.,* 14 B.R. 327 (Bankr. S.D.Fla.1981); *In re Wells,* 227 B.R. 553, 562–63 (Bkrtcy.M.D.Fla.1998); *In re Bofill,* 25 B.R. 550, 552 (Bkrtcy.N.Y.1982); *In re Noonan,* 17 B.R. 793 (Bankr.S.D.N.Y. 1982); *In re W & L Assoc., Inc.,* 71 B.R. 962, 967 (Bankr.E.D.Pa.1987).

3. *Wells* is a case similar to the one at issue, and has been cited favorably by this Court in the unpublished case of *In re Kelley* (Bankr.Case No. 01–27345–BKC– RBR, approved by District Court in Case No. 02–60137–CIV–GOLD–SIMONTON). In *Kelley,* whose fact pattern is similar to the one at issue herein, this Court allowed the rejection of a burdensome executory contract for the sale of realty that had not yet closed despite a state court's issuance of a non-final decree of specific performance, where performance remained to be completed by at least one party to the transaction, and rejection was beneficial to the estate.

4. In *Wells*, Bankruptcy Judge Proctor was faced with a Debtor in Possession, who filed a Chapter 11 solely for the purpose of rejecting a burdensome executory contract with a purchaser of real property, and held that "the power to reject executory contracts is implicit in the Code, and absent other factors, bad faith will not be implied solely because a debtor files in an attempt to reject a financially burdensome contract." In *Wells*, Judge Proctor noted that the traditional bad faith analysis involved single party disputes between Debtor's and their secured lenders which could ordinarily be resolved in a pending mortgage foreclosure action. Judge Proctor noted that the purchaser in *Wells* was not a secured creditor as he possessed no mortgage or security interest in the property. In fact the purchaser in *Wells*, as compared to AJD, at least had an interest in the property by virtue of a lis pendens against it. The lis pendens asserted by AJD against this Property had been dissolved by Order of the circuit court on August 11, 2004, before the bankruptcy case was ever filed. The *Wells'* purchaser then argued to Judge Proctor that Debtor's financial problems were essentially a dispute between the purchaser and the Debtor which can better be resolved in state court. *Id.* However, the Debtor's financial problems here, as those in *Wells* and *Kelley,* involve more than the respective purchasers' specific performance lawsuits.

5. While the Debtor's financial problems herein where caused by the five years of protracted litigation between Balboa and AJD, those financial problems now involve other parties. Primarily they include the secured mortgage holder, to whom the Debtor could not meet its financial obligations due to this ongoing litigation, and who had filed a mortgage foreclosure action, and now seeks stay relief to proceed with that foreclosure action. It also involves the City, who is a first party secured creditor on the subject property, for its demolition liens placed on the property when the building located on the property had to be demolished. This case also involves Broward County due to unpaid real estate taxes. Additionally there is pending administrative litigation with the DEP and the Beach Defense Fund, all involving the nature of the future building on the subject property. Hence, this bankruptcy is much more than a two party dispute.

6. This property has been tied up in litigation over what Debtor believes is a highly burdensome executory contract, which it seeks to reject. It is Debtor's expressed intention to sell the property "as is" by private sale or bankruptcy court auction, so as to pay off the creditors, of the Debtor's estate.

7. If this Court allows the rejection of the contract by the Debtor, AJD's state court specific performance suit, as was the purchaser's in *Wells*, will become moot. AJD will get back its $13,000 deposit from its escrow agent, and will be entitled to file a proof of claim for its rejection damages. In addition it can participate in any auction sale. As such, Debtor's financial difficulties are best handled by the bankruptcy court and the reorganization provisions of the Code.

8. This case is unlike those that have traditionally led to the dismissal of a case for having been filed in bad faith. The critical distinction between this case and those most often associated with single asset real estate cases is that the fundamental dispute driving this case is not with a secured lender looking to foreclose upon a piece of property lacking equity on the eve of foreclosure, but is rather with a rejection of an executory contract.

9. A single asset real estate is not *per se* a bad faith filing, since Congress in the 1994 Amendments to the Bankruptcy Code implicitly allowed "single asset real estate" cases by assigning a definition to them under 11 U.S.C. § 101(51B). "[T]there is nothing inherently improper for a debtor with one single asset to attempt to reorganize its affairs under the rehabilitative provisions of the Bankruptcy Code." *In re Clause Enterprises of Ft. Myers, Ltd.* 150 B.R. 476 (Bankr.M.D.Fla. 1993).

10. The Eleventh Circuit has indicated that the *Phoenix Piccadilly* factors are still applicable in deciding whether to dismiss a single asset real estate case based on debtor's alleged bad faith in filing for Chapter 11 relief. *In re State Street Houses, Inc.,* 356 F.3d 1345 (11th Cir. 2004). The bankruptcy court may consider the so-called *Phoenix Piccadilly* factors: (1) whether debtor has only one asset, the property at issue; (2) whether debtor has few unsecured creditors, whose claims are relatively small compared to claims of secured creditors; (3) whether debtor has few employees; (4) whether property is subject to foreclosure action as result of arrearages on debt; (5) whether debtor's financial problems essentially are a dispute between debtor and secured creditors which can be resolved in pending state court action; and (6) timing of debtor's filing and whether it evidences intent to delay or frustrate legitimate efforts of debtor's secured creditors to enforce their rights. *Id.*

11. This Court finds that under a *Phoenix Piccadilly* analysis the Debtor's Petition was still filed in good faith.

(a) First, the fourth, fifth and sixth factors arising from *Phoenix Piccadilly* and its progeny, require that it is the legitimate rights of a **secured creditor** who is being thwarted in its efforts to enforce its collateral, resulting from a failure to pay arrearages on a secured debt that should be best handled as a two party foreclosure dispute. This case is clearly distinguishable. Moreover, the secured creditor will be paid from the proceeds of the sale.

(b) Second, the foreclosure action is with the mortgagee, Capital Crossings. This secured creditor is not a party to this motion.

(c) Third, Debtor first contemplated bankruptcy during mediation in which both AJD and Capital Crossings participated in mid-July 2004, and first began to consult with bankruptcy counsel in July 2004, and:

(d) Fourth, the State court orders are not final orders.

12. In *In re Park Forest Development Corp.,* 197 B.R. 388 (Bkrtcy.N.D.Ga.1996) the Bankruptcy Court had found that the Debtors had no dishonest or improper intention when they filed their Chapter 11 petitions, and that a "dirt for debt" plan was not filed in bad faith, even though the debtors were single asset real estate entities, with few unsecured creditors and no employees, and were having trouble paying their secured debts. In *Park Forest,* the Bankruptcy Court found that debtors' representative credibly testified that the debtors did not have the cash necessary to pay off all of their debts and that deeding back the real property was the only viable alternative, and the filing of debtors' cases did not stay any imminent action, as mortgagee's state court litigation was continuing against non-debtor guarantors, and, at the time of the filing, the mortgagee was not on the verge of obtaining possession of the debtors' properties.

13. In *In re Star Trust,* 237 B.R. 827 (Bkrtcy.M.D.Fla.1999), single-asset Chapter 11 cases were filed by trusts with few unsecured creditors and no employees,

both of which were essentially two-party disputes with mortgagee, and both of which had been filed on eve of critical foreclosure hearing, yet the Court would not dismiss the cases as having been filed in bad faith, where each trust had begun making monthly payments, and had filed plans to restructure their debt and pay all creditors in full, and there was no indication of any intent to abuse judicial process or purpose of reorganization provisions. Similarly, Balboa herein, has expressly stated that it intends to pay the secured creditors at least a market rate of interest throughout the bankruptcy, and provide the Bank with adequate protection payments, while and until the property is sold, with the intention of paying off all of Balboa's creditors. *See also, In re Jacksonville Riverfront Development, Ltd.,* 215 B.R. 239 (Bkrtcy.M.D.Fla.1997) (Chapter 11 debtor's alleged "bad faith" in filing its "single asset" reorganization case solely in attempt to preserve 180–unit apartment complex in which it lacked any equity, where debtor was not newly formed entity but had owned and operated apartment complex for roughly 17 years, where debtor's monthly reports reflected monthly income that exceeded its disbursements and provided possible source of plan funding, and where no evidence was presented of any wrongdoing by debtor or its principals, or of any unusual or suspect transfers or transactions; mortgagee failed to demonstrate requisite "bad faith").

14. Further case law in support of a "good faith" filing can be found in *In re Clinton Fields, Inc.,* 168 B.R. 265 (Bkrtcy. M.D.Ga.1994), where a petition filed by a single-asset debtor on the eve of a creditor's foreclosing on that asset was filed in "good faith" even though the debtor had few unsecured creditors and case was essentially a dispute between the debtor and the foreclosing creditor. *See also In re Metro Palms I Trust,* 153 B.R. 922 (Bkrtcy.M.D.Fla.1993) (there is nothing inherently improper for a debtor with one single asset, to attempt to reorganize its affairs under the rehabilitative provisions of the Bankruptcy Code); *In re Sarasota Plaza Associates Ltd. Partnership,* 102 B.R. 257 (Bkrtcy.M.D.Fla.1989). In *In re North Redington Beach Associates, Ltd.,* 91 B.R. 166 (Bkrtcy.M.D.Fla.1988) the Court stated that the real test, for determining whether a Chapter 11 petition has been filed in good faith is the presence of an honest intention and a real need and ability on the part of the debtor to effectuate the aim of reorganization, even if this involves a total liquidation of the debtor's assets. This Court finds that Debtor, through the testimony of Jim Thompson, meets that test.

**THEREFORE**, for the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that:

1. AJD's Motion to Dismiss this Chapter 11 Case is hereby **DENIED**.

2. AJD's Motion for Relief from the Automatic Stay is hereby **DENIED**.

3. AJD's Motion for Sanctions is hereby **DENIED**.